In re  George CHOMAKOS and
Nikki Chomakos, Debtors.

David W. ALLARD, Jr., Chapter 7 Trust-
ee of the Estate of George Chomakos
and Nikki Chomakos, Appellant,

v.

FLAMINGO HILTON, Appellee.

No. 94–1712.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 14, 1995.

Decided Nov. 13, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Dec. 20, 1995.

Sheldon S. Toll (argued and briefed), Hon-
igman, Miller, Schwartz & Cohn, Detroit, MI,
for David W. Allard, Jr.

Scott M. Mahoney (argued and briefed),
Las Vegas, NV, for Flamingo Hilton.

Before:  NELSON, RYAN, and McKAY,*
Circuit Judges.

DAVID A. NELSON, Circuit Judge.

This is a bankruptcy case in which the
trustee sought to recover pre-petition gam-
bling losses from the operator of a state-
regulated casino.  The casino operator con-
tended that the opportunity for the debtors
to win more than the sums they bet, coupled
with the entertainment value that the casino
provided its customers, constituted "reason-
ably equivalent value" and "fair consider-
ation" for the bets at issue.  The bankruptcy
court accepted this contention and held that
the bets were not voidable under the Bank-
ruptcy Code or under the Uniform Fraudu-
lent Conveyance Act. The district court af-
firmed the bankruptcy court's decision on
appeal.  We shall affirm the affirmance.

I

The debtors, George and Nikki Chomakos
of Rochester, Michigan, filed a bankruptcy

* The Honorable Monroe G. McKay, United States
Circuit Judge for the Tenth Circuit, sitting by

designation.

petition on August 2, 1990, after having lost several thousand dollars at a casino operated by Flamingo Hilton Corporation in Las Vegas, Nevada. The petition sought relief under Chapter 11 of the Bankruptcy Code, but the matter was soon converted into a Chapter 7 case. The trustee in bankruptcy subsequently commenced an adversary proceeding against Flamingo in the United States Bankruptcy Court for the Eastern District of Michigan.

The trustee's complaint alleged that Mr. and Mrs. Chomakos had been insolvent for six years prior to the filing of the petition; that during this time Nikki Chomakos transferred various sums to Flamingo for the purpose of gambling; that she made some of these transfers during the year preceding the filing; and that she did not receive a reasonably equivalent value or fair consideration in exchange. The complaint was subsequently amended to allege that George Chomakos had also made losing bets at the casino while insolvent. Invoking 11 U.S.C. § 548(a), the trustee sought to recover under that section losses incurred during the year preceding the bankruptcy filing. Under Mich. Comp. Laws 566.11 *et seq.*, Michigan's version of the Uniform Fraudulent Conveyance Act, the trustee sought to recover losses incurred throughout the entire six-year period in which Mr. and Mrs. Chomakos were alleged to have been insolvent.

The case went to trial, and the bankruptcy court found that the debtors should be deemed to have been insolvent from and after January of 1988; that at various times in June and September of 1989 Nikki Chomakos won a total of $9,000 playing slot machines at the Flamingo casino, while losing a total of $14,000; and that George Chomakos lost a net amount of $2,710 at the casino after January of 1988 and before the filing of the petition. The combined net losses of the two debtors during the period when they were insolvent came to $7,710.

In an opinion published as *In re Chomakos,* 170 B.R. 585 (Bankr.E.D.Mich.1993), the bankruptcy court (Shapero, J.) held that the

relief requested by the trustee should be denied because defendant Flamingo gave reasonably equivalent value in exchange for the debtors' money. The order denying relief was appealed to the district court. That court affirmed the decision on the basis of Judge Shapero's opinion, and the trustee filed a timely notice of appeal.

## II

■ Under the fraudulent transfer section of the Bankruptcy Code, the trustee may undo as constructively fraudulent any property transfer made by the debtor within one year before the filing of the petition if the debtor was insolvent on the date of the transfer and "received less than a reasonably equivalent value in exchange for [the] transfer. ..." 11 U.S.C. § 548(a)(2)(A) and (B)(i).[1] "Value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor...." 11 U.S.C. § 548(d)(2)(A).

Under Michigan's Uniform Fraudulent Conveyance Act, to which Flamingo does not deny it is subject, a conveyance made by one who is insolvent is fraudulent as to creditors if made without a fair consideration. Mich. Comp. Laws 566.14. "Fair consideration" is given for property, Mich. Comp. Laws 566.13 provides, "[w]hen in exchange for such property ... as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied...." The Michigan statute does not have a time limit corresponding to that in the Bankruptcy Code; the two provisions are substantially the same otherwise.

■ The point in time as of which we must determine whether Mr. and Mrs. Chomakos received property of reasonably equivalent value in exchange for the money they wagered at the casino is the point at which their bets were placed. See *In re Morris Communications NC, Inc.,* 914 F.2d 458, 466 (4th Cir.1990), quoting *Collier on Bankruptcy* § 548.09 at p. 116 (15th ed.1984) as follows:

---

**1.** None of the other grounds for avoidance set forth in § 548—that the transfer was made with actual intent to hinder, delay or defraud creditors, *e.g.,* see § 548(a)(1)—is asserted by the trustee here.

"The critical time is when the transfer is 'made.' Neither subsequent depreciation in nor appreciation in value of the consideration affects the ... question whether reasonable [sic] equivalent value was given."

Where gambling is lawful, as it was in the case at bar, the placing of a bet gives rise to legally enforceable contract rights. These contract rights constitute "property," of course, and at the time which Collier identifies as "critical"—a time before anyone can know whether the bet will be successful—the property has economic value. The property is not unlike futures contracts purchased on margin. The investor in futures may win big, or his position may be wiped out, but the contractual right to a payoff if the market happens to move the right way at the right time constitutes a value reasonably equivalent to the money at risk.

The trustee's brief takes the bankruptcy court to task for making the suggestion—a suggestion characterized by the trustee as "incredible"—that gambling is arguably "an 'investment' that can have economic value...." *Chomakos,* 170 B.R. at 593. But the trustee looks at the picture only as of the time when Mr. and Mrs. Chomakos left the casino "with nothing in exchange for the monies they gambled away." The time that counts is not the time when the bet is won or lost, but the time when the bet is placed. The "investment" may turn out badly, but unless and until it does, the contractual right to receive payment in the event that it turns out well is obviously worth something.

*Morris Communications* illustrates the point nicely. At issue there was the valuation of the debtor's interest in a corporation ("C–PACT") that had only one asset—an application pending before the Federal Communications Commission for a cellular telephone license. Licenses were to be awarded at a future date under a lottery procedure. C–PACT had a chance of winning a license, but it also had a chance of losing. If the license were won, C–PACT stock would have substantial value; if the license were lost, the stock would be worthless. Before the lottery took place, the debtor sold its C–PACT stock for a price negotiated at arm's length. Re-jecting a claim that the price was too low, the court of appeals held that the debtor's transfer of the stock was not voidable under 11 U.S.C. § 548(a)(2)(A) and (B).

The games of chance in which Mr. and Mrs. Chomakos participated (slot machine games and blackjack) were not FCC lotteries, of course, and a casino gambler is not kept waiting for months to learn whether a particular bet is successful. The principle, however, is the same in both cases. Take blackjack, for instance. The trial record shows that a person who bets $2 at the blackjack table where Mr. Chomakos did his gambling will win $3 if he receives a black jack. At the point in time when Mr. Chomakos placed a $2 bet, his chance of winning $3 had an economic value no less real in nature than the economic value of C–PACT's chance of winning a cellular telephone license.

The existence of an economic value may be immaterial, however, if the dollar value of the gambler's chance of winning—augmented, perhaps, by an element of entertainment value—is not "reasonably equivalent" to the amount of money wagered. We believe that the evidence presented by Flamingo showed a reasonable equivalency here, and the trustee presented no evidence to the contrary.

The casino's evidence showed, among other things, that the gambling business in Nevada is closely regulated by the state; that this regulation extends to payout ratios for both slot machines and table games; that casinos depend on repeat business, which is encouraged by customers winning; and that competition among casinos is intense. The evidence further showed that a three dollar slot machine bet could produce a jackpot of over a million dollars, which would be paid on the spot; that in a single year, Flamingo slot machine players had more than 9,500 jackpots of $1,200 or more, in addition to many lesser jackpots; that for all the dollars deposited in all Flamingo slot machines over the course of a year, Flamingo paid out 94 percent in winnings; and that the payout ratio for the particular machines played by Mrs. Chomakos was even higher, ranging from 95.73 percent to 97.43 percent. The customer enjoys better odds at the blackjack table, moreover. Assuming the blackjack player has a fair knowledge of the game and

uses good basic strategy, the evidence showed that the house advantage is only one percent or less.

The trustee disputes none of these facts and does not seriously challenge Flamingo's good faith. Looking at the situation from the standpoint of creditors, however, the trustee argues that the very existence of a house advantage, coupled with the fact that Mr. and Mrs. Chomakos ultimately lost more than they won, means that there was no reasonably equivalent economic benefit. And citing *In re Young*, 148 B.R. 886 (Bankr. D.Minn.1992), *aff'd* 152 B.R. 939 (D.Minn. 1993), where church contributions made by an insolvent donor were held to be fraudulent conveyances, the trustee maintains that it would be anomalous for gambling losses not to be treated as fraudulent conveyances too.

As far as church contributions are concerned, the cases are in conflict. While the *Young* donor was held not to have received reasonably equivalent value, bankruptcy courts reached a contrary result in *In re Missionary Baptist Foundation of America, Inc.*, 24 B.R. 973 (Bankr.N.D.Tex.1982), and *In re Moses*, 59 B.R. 815 (Bankr.N.D.Ga. 1986). There is no need for us to take sides in the church contribution controversy, however. Looking at the matter from the standpoint of creditors, as the trustee urges us to do, it seems reasonably clear that the intangible property rights accruing to Mr. and Mrs. Chomakos when they placed their bets differed significantly from the benefits accruing to the donors in the church contribution cases.

A debtor who contributes to a church may receive spiritual and social returns of great value to the debtor, but such returns are not likely to be of much benefit to creditors. A debtor who places a bet in a fair and lawful game of chance, on the other hand, may receive hard cash in return. On one of the days when Mrs. Chomakos played Flamingo's slot machines, for example, she had winnings of $5,000. Suppose she had won a $5,000 jackpot at the start of her visit to the casino and had stopped playing as soon as she won; the return on her "investment" would obviously have benefited her creditors.

It is true that gambling odds always favor the house, and that Mrs. Chomakos would have been almost certain to lose her $5,000 jackpot—and more—if she continued playing long enough. On the record before us, however, we cannot say that the existence of a modest house advantage means that unsuccessful bets are fraudulent conveyances.

The trustee argues that Mr. and Mrs. Chomakos did not occupy a bargaining position equal to Flamingo's, and the gambling transactions were therefore not at arm's length. But this argument overlooks the governmental and business forces by which Flamingo was constrained. Flamingo was subject to state regulations designed to create a reasonably level playing field, and Flamingo had to compete with nearby casinos to which Mr. and Mrs. Chomakos and all other customers were free to take their business. Without reasonably generous payouts and competitive odds, Flamingo could not hope to attract the repeat customers on whom, according to the evidence, Flamingo and other casino operators depend for survival. "[T]he *quid pro quo*," as the bankruptcy court observed, "was established in the context of a state regulated business, existing in an open competitive marketplace responding and responsive to desires of legitimate tourists pursuing and engaging in a legal and legitimate pursuit." *Chomakos*, 170 B.R. at 592.

As far as federal law is concerned, moreover, we are not persuaded that we ought to evaluate the transactions at issue here solely from the standpoint of creditors. Casino patrons receive what the bankruptcy court called "psychic and other intangible values," just as patrons of a fine restaurant do, for example. *Id.* at 593. If, instead of gambling, Mr. and Mrs. Chomakos had spent $7,710 on expensive dinners, the creditors would have been no better off than they are now. Yet the trustee concedes that the restaurateur would not be liable for return of the money—and when asked at oral argument how money spent at a blackjack table differs from money spent at a dinner table, the trustee had no satisfactory answer.

The judgment affirming the decision of the bankruptcy court is **AFFIRMED**.