**In re Marjorie Forbes GRIGONIS, Debtor.**

**Richard J. SAMSON, Trustee, Plaintiff,**

**v.**

**U.S. WEST COMMUNICATIONS, INC., Defendant.**

Bankruptcy No. 95–31953–7.
Adversary No. 97/00010.

United States Bankruptcy Court,
D. Montana.

May 23, 1997.

Richard J. Samson, Christian & Samson, P.C., Missoula, MT, for Plaintiff.

Paul M. Grant, Denver, CO, for Defendant.

## ORDER

JOHN L. PETERSON, Chief Judge.

In this adversary proceeding, the parties stipulated to submission of the instant Complaint filed by Plaintiff, Richard J. Samson, Trustee ("Trustee"), against Defendant, U.S. West Communications, Inc. ("USW"), on January 16, 1997, and amended April 4, 1997, on an Agreed Statement of Facts. The parties then filed, on May 16, 1997, simultaneous memoranda of law in support of their respective positions, and the Court took the matter under advisement. The determinative issues involve whether, pursuant to 11 U.S.C. §§ 548(a)(2)(A) and 544(b), a bankruptcy trustee can avoid pre-petition transfers made in payment for fair-market-priced service

charges as given for other than "reasonably equivalent value" when the services purchased merely gratify idiosyncratic consumer tastes at the expense of the debtor's estate.

## I.

### AGREED FACTS

1. The debtor, Marjorie Forbes Grigonis, filed a petition under Chapter 7, Title 11, U.S.C., in the United States Bankruptcy Court for the District of Montana on November 7, 1995.

2. The Plaintiff was appointed to serve as the Chapter 7 Trustee on the same date and duly qualified and been serving in that capacity since the Meeting of Creditors held on December 6, 1995.

3. The Defendant, USW, is a Colorado corporation authorized and doing business in the State of Montana.

4. The debtor, at the date of filing of her petition, was a seventy two (72) year old widow residing in the Clark Fork Riverside Retirement Center, an assisted living center for senior citizens located in Missoula, Montana.

5. At the time of filing of her Chapter 7 petition, and for the antecedent two year period, the debtor's sole income was derived from monthly social security benefits. At the time of the filing of her Chapter 7 petition, the debtor's monthly income from social security was in the amount of $557.00. Her average monthly living expenses were approximately $521.00.

6. In the two (2) year period preceding the filing of her Chapter 7 petition, the debtor incurred telephone charges based on her use of "900," telephone services. The charges incurred by the debtor for her use of 900 services were for calls placed by her to obtain "psychic" and other related types of information. The 900 services used by the debtor included, but were not limited to, Psychic, Tarot Line, Mystic Meg, Starreader, Multiquest, Premium and Jeanne Dixon. On several occasions, the debtor was solicited by one or more of the above-listed providers to utilize their service to obtain current "psychic" information.

7. 900 service is a pay-per-call telephone service, accessed by dialing a 900 prefix before a regular seven digit telephone number, which has a primary purpose of providing information to the caller.

8. From the time period of November 1993 through October 1994, the debtor incurred and paid the following charges for 900 services:

| BILL DATE | 900 CHARGES |
| --- | --- |
| 11/16/93 | $ .00 |
| 12/16/93 | 1.90 |
| 1/16/94 | .00 |
| 2/16/94 | .00 |
| 3/16/94 | .00 |
| 4/16/94 | .00 |
| 5/16/94 | .00 |
| 6/16/94 | 5,256.56 |
| 7/16/94 | .00 |
| 8/16/94 | 717.61 |
| 9/16/94 | 959.52 |

9. From the time period of October 1994 through June 1995, the debtor incurred and paid the following charges for 900 services:

| BILL DATE | 900 CHARGES |
| --- | --- |
| 10/16/94 | $ 821.00 |
| 11/16/94 | 448.15 |
| 12/16/94 | 1,674.18 |
| 1/16/95 | 227.27 |
| 2/16/95 | 1,144.41 |
| 3/16/95 | 1,375.88 |
| 4/16/95 | 3,464.86 |
| 5/16/95 | 2,011.38 |
| 6/15/95 | 3,208.90 |

All of the payments listed in this paragraph were made within one (1) year of the filing of the debtor's petition.

10. The debtor failed to pay the charges for 900 services which appeared on her July 16, 1995, and August 16, 1995, billing statements in the total amount of $5,400.17. As per USW's policy, the debtor's failure to pay for such 900 services did not affect USW's provision of local telephone service to the debtor.

11. The debtor did not incur any charges for 900 services from July 17, 1995, to her petition date.

12. In order to make many of the above-referenced payments to USW, the debtor utilized cash advance checks issued to her by various credit card companies. In most instances, debtors's payments utilizing cash advance checks were made to USW on a monthly basis until the time she first consulted with her attorney in September 1995, regarding the filing of a Chapter 7 proceeding. All of the credit card companies to whom the debtor was obligated for the issuance of the cash advance checks are included as unsecured creditors in her bankruptcy proceeding.

13. The debtor's decision to file her Chapter 7 petition resulted from her financial inability to repay the credit card companies to whom she was obligated for the issuance of the cash advance checks to USW. As of the date of the filing of her Chapter 7 petition, the debtor's monthly income and other personal assets were not of sufficient value to "repay all of her obligations."

14. As of the date the debtor filed her bankruptcy petition, she listed the value of all her assets in the amount of $43,228.00. As of the petition filing date, the debtor listed her total liabilities in the sum of $47,928.32. Included as part of the value of the debtor's assets was a potential claim against AT&T Multiquest 900 Services in the amount of $35,000.00. The debtor's liabilities included credit card debt in the amount of $13,000.00 to Bankcard Services, $5,500.00 to Discover Card, $9,500.00 to First Card and $7,850.00 to Nations Bank.

15. All of the 900 charges incurred and paid by the debtor resulted from her use of phone services provided by AT&T 900 Services (hereinafter "AT&T") and/or MCI 900 Services (hereinafter"MCI").

16. USW does not provide 900, services. Under agreements with both AT&T and MCI, the charges incurred for the use of 900 phone services provided by those entities were included as part of the debtor's monthly bill for local and long distance services sent to her by USW. The debtor's payments for the 900 charges owing to AT&T and/or MCI were remitted directly to USW.

17. Based on her July 16, 1995, billing statement, the debtor's average cost for long distance service provided by AT&T, exclusive of 900, charges, was approximately twenty cents ($.20) per minute. (See Exhibit A.)

18. Based on her July 16, 1995, billing statement, the debtor's average cost for 900, phone services provided by AT&T was $3.89 per minute. (Exhibit B.)

19. Based on her July 16, 1995, billing statement, the debtor's average cost for 900, phone services provided by MCI was $2.96 per minute. (See Exhibit C.)

20. The cost of 900 service to the end user is determined by the provider of the 900 service. End users of 900 service pay uniform rates for each respective 900 service. Accordingly, end users are charged identically for 900, calls of the same duration, made in the same time period of the day, and to the same information provider regardless of where the call originates.

21. All of the debtor's bills which included charges for 900 services included the following notice regarding 900 service:

FOR 900 BILLING DISPUTES OR INQUIRIES, PLEASE CALL 1800–642–2708. YOU HAVE 60 DAYS FROM THE DATE OF THIS BILL TO DISPUTE A 900 BILLING ERROR. YOU HAVE THE RIGHT TO WITHHOLD PAYMENT OF THE DISPUTED 900 CHARGES DURING THE BILLING ERROR REVIEW. NO COLLECTION ACTIVITY FOR DISPUTED 900 CHARGES WILL OCCUR WHILE THE CHARGES ARE UNDER INVESTIGATION. AFTER INVESTIGATION, IF IT IS DETERMINED THAT THE DISPUTED 900 CHARGES ARE LEGITIMATE, AT&T OR THE INFORMATION PROVIDER MAY PROCEED WITH OUTSIDE COLLECTIONS AGAINST YOUR ACCOUNT FOR NONPAYMENT FOR NONPAYMENT OF THESE CHARGES. YOUR LOCAL AND LONG DISTANCE SERVICE CANNOT BE DISCONNECTED FOR NONPAYMENT

OF 900 CHARGES. FAILURE TO PAY LEGITIMATE 900 CHARGES MAY RESULT IN INVOLUNTARY BLOCKING OF YOUR ACCESS TO 900 SERVICE. VOLUNTARY BLOCKING OF ACCESS TO 900 SERVICES IS AVAILABLE UPON REQUEST FROM YOUR LOCAL EXCHANGE CARRIER WHERE TECHNICALLY FEASIBLE.

The debtor never requested that USW block her access to 900 services.

22. Under existing agreements with both AT&T and MCI, USW purchases their accounts receivable which arise from the use of 900 phone services. Further, as part of its agreement with both AT&T and MCI, USW has recourse against said entities in the event an account it has purchased is not paid.

## II.

In order to avoid transfers pursuant to 11 U.S.C. § 548(a)(2)(A) [1]:

[T]he Trustee must show (1) the Debtor had an interest in the property transferred; (2) the Debtor was insolvent at the time of the transfer or was rendered insolvent as a result of the transfer; (3) the transfer occurred within one year of the bankruptcy petition; and (4) the transfer was for less than reasonably equivalent value.

*Hussey v. Haider et al. (In re Haider)*, 126 B.R. 796, 798 (Bankr.Mont.1991); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S.Ct. 1757, 1760, 128 L.Ed.2d 556 (1994). Of these factors, only number (4)—the transfer was for less than reasonably equivalent value—do the instant parties dispute.

The issues in *Haider* concerned whether a forced sheriff's auction achieved a sale price for "reasonably equivalent value." The Court used a "totality of circumstances" analysis to hold that since the sheriff made the sale in a commercially reasonable manner in accordance with state law, including taking steps to ensure "the best price possible by exposing the property to the market over a sufficient period of time," the sale satisfied the reasonably equivalent value standard. *Id.* at 799–800 (following *Lindsay v. Beneficial Reinsurance Co. (In re Lindsay)*, 98 B.R. 983, 991 (Bankr.S.D.Cal.1989)). The *Haider* decision stands for the proposition that reasonably equivalent value means a reasonable measure of remuneration given the particular circumstances in question.

In a more recent case, the U.S. Supreme Court reached a virtually identical conclusion with regard to a foreclosure sale, holding that if the sale proceeded in harmony with local law, the price attained defined the "reasonably equivalent value" of the item sold, admonishing that "market value cannot be the criterion of equivalence in the foreclosure-sale context." *BFP*, 511 U.S. at 538, 114 S.Ct. at 1761–1762. Both *Haider* and *BFP*, however, dealt expressly—and in the latter decision exclusively—with foreclosure sale conditions. As the Court in *BFP* offered for clarification:

But property that *must* be sold within [foreclosure sale] strictures is simply *worth less*. No one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques. And it is no more realistic to ignore that characteristic of the property (the fact that state foreclosure law permits the mortgagee to sell it at forced sale) than it is to ignore other price-affecting characteristics (such as the fact that state zoning law permits the owner of the neighboring lot to open a gas station). Absent a clear statutory requirement to the contrary, we must assume the validity of this state-law regu-

---

1. § 548. **Fraudulent transfers and obligations**
   (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

   . . . .
   (2)(a) received less than a reasonably equivalent value in exchange for such transfer or obligation; . . .

latory background and take due account of its effect. "The existence and force and function of established institutions of local government are always in the consciousness of lawmakers and, while their weight may vary, they may never be completely overlooked in the task of interpretation." *Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 154, 64 S.Ct. 474, 480, 88 L.Ed. 635 (1944). *Cf. Gregory v. Ashcroft,* 501 U.S. 452, 456–462, 111 S.Ct. 2395, 2399–2401, 115 L.Ed.2d 410 (1991).

There is another artificially constructed criterion we might look to instead of "fair market price." One might judge there to be such a thing as a "reasonable" or "fair" forced-sale price. Such a conviction must lie behind the *[In re ] Bundles* inquiry into whether the state foreclosure proceedings "were calculated ... to return to the debtor-mortgagor his equity in the property." 856 F.2d [815], 824 [ (7th Cir.1988) ]. And perhaps that is what the courts that follow the *Durrett [v. Washington Nat. Ins. Co.,* 621 F.2d 201 (5th Cir.1980) ] rule have in mind when they select 70% of fair market value as the outer limit of "reasonably equivalent value" for forecloseable property (we have no idea where else such an arbitrary percentage could have come from). The problem is that such judgments represent policy determinations which the Bankruptcy Code gives us no apparent authority to make. How closely the price received in a forced sale is likely to approximate fair market value depends upon the terms of the forced sale—how quickly it may be made, what sort of public notice must be given, etc. But the terms for foreclosure sale are not standard. They vary considerably from State to State, depending upon, among other things, how the particular State values the divergent interests of debtor and creditor. To specify a federal "reasonable" foreclosure-sale price is to extend federal bankruptcy law well beyond the traditional field of fraudulent transfers, into realms of policy where it has not ventured before. Some sense of history is needed to appreciate this.

*BFP,* 511 U.S. at 539–540, 114 S.Ct. at 1762–1763 (fn.omitted). As the foregoing passage makes clear, the *BFP* decision hinges chiefly on principals of federalism, and illuminates why Congress did not use the term "fair market value" in the transfer avoidance provisions of the Bankruptcy Code. It simply did not wish to "disrupt the ancient harmony [between] foreclosure law and fraudulent conveyance law," the latter of which—depending on the jurisdiction—does not necessarily void transfers for less than fair market value when provisions of the former are observed. *Id.* at 543, 545, 114 S.Ct. at 1764, 1765. This deference to state law in the foreclosure context, however, does "not render § 548(a)(2) superfluous, since the 'reasonably equivalent value' criterion will continue to have independent meaning *(ordinarily a meaning similar to fair market value )* outside the foreclosure context." *Id.* (emphasis added). Thus, the Supreme Court has not rejected fair market value as a measure of "reasonably equivalent value" for all contexts.

■ Generally speaking, courts have held that for the purposes of fraudulent conveyance avoidance, the proper standpoint for subjective valuation is that of the creditors. *See Gill v. Maddalena (In re Maddalena),* 176 B.R. 551, 555 (Bankr.C.D.Cal.1994); *Wyle v. C.H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 597 (9th Cir. 1991). This furthers the policy behind § 548 by preserving assets of the estate for eventual distribution to claim holders. *Id.* The general rule, however, if applied blindly without regard for the nature of consumer transactions, will result in absurdity. For instance, circumstances like the ones at hand involve strictly consumer transactions in which a debtor transfers funds in exchange for a personal service that can yield no pecuniary return to the debtor. To the contrary, once accepted, the purchaser immediately and completely consumes the benefits of such services, and therefore, the services received have a liquidation or "second-hand" value of zero. Thus, consumer purchases for solely personal gratification furnish only "psychic

and intangible" benefits or "entertainment value" to the debtor personally, and by definition, always results in asset depletion. *See Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 771, 772 (6th Cir.1995). By the same token, transfers of funds to secure such enjoyments can by definition be of no value to creditors, and consequently, if only the viewpoint of creditors signifies, such transfers must by definition be regarded only as fraudulent. This result is of course nonsense.

■ Given the foregoing, in cases of the purchase of non-tangible consumer goods, the Court finds itself convinced by the *obiter dictum* set forth in *Chomakos*, 69 F.3d at 772, which opines thus:

> [W]e are not persuaded that we ought to evaluate the transactions at issue here [casino gambling] solely from the standpoint of creditors. Casino patrons receive what the bankruptcy court called "psychic and other intangible values" just as patrons of a fine restaurant do, for example. If instead of gambling, [the Debtors] had spent $7,710 on expensive dinners, the creditors would be no better off than they would now. (Citations omitted).

As well as the restaurant example cited above, the Court can with little effort imagine an array of consumer transactions that result in absolutely no benefit to the purchasers' creditors—from tickets to Broadway shows and exclusive sporting events, to hourly charges for music, sports or language lessons, to any and all forms of recreational travel, to name a few. While Congress may at some point decide to include payments for such extravagances in the list of transfers avoidable by a trustee in Chapter 7 absent a finding of bad faith,[2] the Court now holds that the current statutory structure does not allow for such extraordinary powers. Notwithstanding that "Congress left to the courts the obligation of marking the scope and meaning of [reasonably equivalent val-

ue]," *Morris Communications NC*, 914 F.2d at 466, without legislative mandate, this Court refuses to implement reform with such sweeping implications by mere judicial fiat. Thus, in the case of non-durable consumable goods and services, the acquisition of which benefits a debtor's creditors in no way, the Court holds that a "totality of the circumstances" analysis similar to that employed in *Haider*, 126 B.R. at 799, must be used to determine "reasonably equivalent value." *See Cooper v. Ashley Comm. Inc., (In re Morris Comm.)*, 914 F.2d 458, 466 (4th Cir. 1990).

■ The totality of the circumstances test "requires case-by-case adjudication," with the "starting point [for such review] as the fair market value" of the property transferred. *Id.* The factors courts must consider in this inquiry (hereinafter the "*Morris* factors") include:

> [T]he good faith of the transferee, the relation differences in the amount paid compared to the fair market value, and the percentage of the amount paid is of the fair market value.

> Another factor said to be of "considerable importance" in assessing reasonable equivalence is whether the sale was "an arm's length transaction between a willing buyer and a willing seller."

*Id.* at 467. *Accord, Jacoway v. Anderson (In re Ozark Restaurant Equip. Co., Inc.)*, 850 F.2d 342, 345 (8th Cir.1988). While the foregoing does not comprise binding precedent, the Ninth Circuit Bankruptcy Appellate Panel has held, "we should 'give most respectful consideration to the decisions of the other Courts of Appeals and follow them whenever we can.'" *In re Camilli*, 182 B.R. 247, 251 (9th Cir. BAP 1995) (citing *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1123 (7th Cir.1987)); *accord, Taffi v. United States (In re Taffi)*, 68 F.3d 306, 308 (9th Cir.1995) (adopting "a cautionary rule, counseling against creating intercircuit conflicts").

---

**2.** Should a trustee find evidence of an "intent to hinder, delay or defraud," § 548(a)(1) offers suf-

ficient recourse.

Thus, the Court hereby adopts the foregoing considerations when applying a totality of the circumstances test in the instant context.

The Court makes such holding taking due notice of the criticism of a bankruptcy court's application of the totality of the circumstances test in *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L. Inc.)* 92 F.3d 139, 148–149 (3rd Cir.1996). In *R.M.L.* the court held:

> This definitional problem is exacerbated in cases where, as here, the debtor exchanges cash for intangibles, such as services or the opportunity to obtain economic value in the future, the value of which is difficult, if not impossible, to ascertain. Because such intangibles are technically not within § 548(d)(2)(A)'s definition of "value," courts have struggled to develop a workable test for reasonably equivalent value. *See generally In re Young*, 82 F.3d 1407 (8th Cir.1996) (determining whether debtors obtained "value" in exchange for charitable contributions to church); *In re Chomakos*, 69 F.3d 769 (6th Cir.1995) (examining whether debtors obtained "value" in exchange for $7,710 in gambling losses), *cert. denied,* —— U.S. ——, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996); *In re Morris Communications NC, Inc.,* 914 F.2d at 458 (attempting to determine "value" of shares in corporation whose only asset was a license application pending before the FCC that had a one in twenty-two chance of approval); *In re Fairchild Aircraft Corp.,* 6 F.3d 1119, 1125–26 (5th Cir.1993) (deciding whether money debtor spent in failed attempt to keep commuter airline afloat conferred "value" on the debtor).

> In attempting to determine whether Mellon's commitment letter conferred any value on [R.M.S.], the bankruptcy court purported to apply a totality of the circumstances test. Drawn from other reasonably equivalent value cases, that test takes into account the fair market value of the item received by, or services performed for, the debtor; the existence of an arm's-length relationship between the debtor and the transferee; and the good faith of the

> transferee. These factors, however, have no bearing on whether any "value" was actually conferred on the debtor. At most, the fair market value and the arm's-length nature of the relationship are relevant to the price the debtor paid. But the price that the debtor paid, in and of itself, reveals nothing about whether the debtor received something of actual "value."

*Id.* at 148–149. The *R.M.L.* court, however, did not reject a totality of circumstances test. Rather it merely clarified that—as a threshold issue—before it can apply the test, a "court must [first] make an express factual determination as to whether the debtor received any value at all." *Id.* Since the bankruptcy court had found, as a matter of fact, that because a loan commitment letter purchased by the debtor in the case "essentially offered only a very slim 'chance' of [providing] a substantial economic benefit in the future [in that] it contained numerous conditions that. in all likelihood, could not have been satisfied," it "failed to confer any significant intangible benefits on [debtor]." *Id.* at 150–151. In *R.M.L.* no consumer gratification occurred, or was even contemplated, and therefore the court found no "significant" economic benefit in a strictly business sense. On the other hand, in the case at bar, Debtor received "significant intangible benefits" in the form of consumer services. Thus, even under the holding of *R.M.L.,* to the extent that it binds this Court, the totality of the circumstances serves as the proper inquiry.

The Trustee also asserts avoidance of the transfers in question pursuant to 11 U.S.C. § 544(b), which provides:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title,

Thus § 544(b) gives a bankruptcy trustee the right to avoid transfers voidable by unsecured creditors under Montana's version of

the Uniform Fraudulent Transfer Act ("UFTA"), codified at Mont.Code Ann. §§ 31–2–327 through 31–2–342 (1991). Terms of the UFTA, however, bear a close resemblance to the language of § 548(a)(2)(A) in form and substance.[3] Consequently, the Court will interpret Montana's fraudulent transfer provisions contemporaneously with those of the Bankruptcy Code. *In re United Energy Corp.*, 944 F.2d 589, 594 (9th Cir.1991).

### III.

■ Applying the foregoing to the facts at bar, the Court finds that under the totality of circumstances, the Trustee has failed in his burden of showing that Debtor did not receive reasonably equivalent value for the transfers in payment of 900 telephone service charges. Under the *Morris* factors, first, there has been no showing, or even allegation of bad faith on the part of the transferee, USW. Second, the record indicates that Debtor paid no more than the fair market value for the 900 services, the same as charged by the providers to other customers for identical services at identical times and call durations. (Agreed Facts, ¶ 20.) Finally, and of "considerable importance" in assessing reasonable equivalence, the record reflects that these transactions occurred at arm's length between "a willing buyer and a willing seller." *Morris*, 914 F.2d at 467. While the providers did solicit calls from Debtor, (Agreed Facts, ¶ 6), the facts indicate no undue harassment or coercion on the part of the soliciting parties.

■ Finally, USW could not have disconnected Debtor's phone service for failure to pay 900 charges. Thus, the Trustee asserts

that, under a line of cases in which courts have held that debtors do not give non-mandatory religious offerings "in exchange for" religious services and therefore such gifts fall within the avoidance provisions of § 548(a)(2)(A), *see, e.g., Fitzgerald v. Magic Valley Evangelical Free Church, Inc. (In re Hodge)*, 200 B.R. 884 (Bankr.D.Idaho 1996), Debtor did not transfer funds to USW "in exchange for" value. These cases, however, bear little if any significance for the issues at hand. In the religious offering cases, the recipient churches did not condition membership in good standing on whether or to what extent parishioners made voluntary contributions. *Id.* at 893. In the case at bar, while USW could not disconnect Debtor's other phone services for nonpayment of 900 charges, the facts clearly indicate that USW conditioned Debtor's continued access to 900 services upon her payment of the 900 charges. (Agreed Facts ¶ 22.) In addition, the services provided by churches in the religious contribution cases did not gain for the churches a contract right to payment, while the 900 providers in the instant case clearly did—which they could have pursued through a variety of collection activities. Thus, despite the Trustee's analysis, the Court holds that Debtor did pay funds "in exchange for" value from USW and the 900 service providers.

### CONCLUSION

The Trustee has failed to show that Debtor did not receive "reasonably equivalent value" for the funds transferred to USW in payment for 900 service charges. Moreover, the Trustee has failed to show that Debtor did not advance the funds "in exchange for" services provided by USW and its predecessors

. . .

---

**3.** For instance, § 31–2–333(1)(b) provides:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred. if the debtor made the transfer or incurred the obligation:

\* \* \* \* \* \*

(b) without receiving a reasonably equivalent value in exchange for the transfer or obligation

959

in interest. Consequently, 11 U.S.C. §§ 544(b) and 548(a)(2)(A) provide no means for the Trustee to avoid the transfers. Accordingly,

IT IS ORDERED the Clerk of Court shall enter judgment in favor of Defendant, U.S. West Communications, Inc. and against Plaintiff, Chapter 7 Trustee, dismissing the Trustee's Complaint in its entirety.