In re TOWER ENVIRONMENTAL, INC., Debtor.

Official Committee of Unsecured Creditors, Plaintiff,

v.

State of Florida, Defendant.

Bankruptcy No. 95–7219–8G1.
Adversary No. 96–679.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Sept. 9, 1998.

Michael Markham, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Clearwater, Florida, for plaintiff.

Todd B. Grandy, Henry A. Gill, Office of the Attorney General, State of Florida, Tampa, Florida, for defendant.

## ORDER ON COMMITTEE'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT STATE OF FLORIDA'S MOTION FOR SUMMARY JUDGMENT

PAUL M. GLENN, Bankruptcy Judge.

**THIS CASE** came before the Court to consider the Motion for Summary Judgment filed by the Official Committee of Unsecured Creditors (the Committee), and also to consider the Motion for Summary Judgment filed by the Defendant, the State of Florida (the State).

The Motions are directed to an Amended Complaint filed by the Committee in this adversary proceeding. The Amended Complaint contains four counts. Count I is an action to recover fraudulent transfers pursuant to § 548 and § 550 of the Bankruptcy Code; Count II is an action to recover fraudulent transfers pursuant to § 544 and § 550 of the Bankruptcy Code and Florida Statutes § 726.105(1)(b) and § 726.106(1); Count III is an action for equitable subordination pursuant to § 510 of the Bankruptcy Code; and Count IV is an action to disallow a claim pursuant to § 502(d) of the Bankruptcy Code. The Committee's Motion relates only to Counts I, II, and IV of the Amended Complaint. The State's Motion relates to all counts contained in the Amended Complaint.

Both parties contend that there is no genuine issue as to any material fact and that they are entitled to the entry of a judgment as a matter of law.

## Background

By Florida Statute § 376.3071, the Florida Legislature created the Inland Protection Trust Fund (the Fund). Fla.Stat. § 376.3071(3). The Fund is administered by the Department of Environmental Protection. Fla.Stat. § 376.3071(3). The Department is an administrative unit within the executive branch of Florida's state government. Fla.Stat. §§ 20.03 and 20.04. The purpose of the Fund is to serve as a repository for funds which will enable the Department to respond to incidents of inland contamination related to the storage of petroleum and petroleum products. Fla.Stat. § 376.3071(2). The Fund is funded by certain excise taxes, by a loan from the Florida Coastal Protection Trust Fund, and by all penalties, judgments, recoveries, reimbursements, and other fees and charges credited to the Fund relating to the implementation of the Fund. Fla.Stat. § 376.3071(6).

An owner, operator, or his or her designee of a site which is eligible for restoration funding assistance is entitled to reimbursement from the Fund of allowable costs for completed program tasks, subject to specified statutory conditions. Fla.Stat. § 376.3071(12). From the Fund, the Department shall reimburse the actual and necessary costs of site rehabilitation. Fla. Stat. § 376.3071(12). Procedures for initiating and conducting site rehabilitation, maintaining records, and applying for reimbursement are established. Fla.Stat. § 376.3071(12) The Department is authorized to audit restoration costs, and is required to seek recovery of overpayments based on the findings of the audits. Fla. Stat. 376.3071(12).

The Debtor, Tower Environmental, Inc., was an environmental consulting firm. The Debtor or its subcontractors provided labor, materials, and services for the assessment and remediation of contaminated properties. Specifically, the Debtor entered into contracts with owners of eligible rehabilitation sites and assessed and remediated the contaminated soil and ground water. Following such remediation, the Debtor sought reimbursement from the Fund as described above.

An involuntary petition was filed against the Debtor under Chapter 7 of the Bankruptcy Code on July 20, 1995. No order for relief was entered-under Chapter 7. With the Debtor's consent, an order for relief under Chapter 11 was entered on August 24, 1995. In its Chapter 11 case, the Debtor proposes to liquidate all of its assets.

This adversary proceeding centers on a Plea Agreement entered by the State and the Debtor, as the successor corporation to Consolidated Credit Group, Inc. (CCG). In the Plea Agreement, the parties made certain factual stipulations for purposes of the Agreement. The parties stipulated, for example, (1) that CCG submitted 43 applications for reimbursement of remediation costs from the Fund between February 13, 1991, and April 2, 1992; (2) that on a series of occasions, CCG had misrepresented that its general contractor had been paid, when in fact the general contractor was holding checks without payment, and that CCG had made the misrepresentation with the specific purpose of receiving funds to which it was not entitled; and (3) that CCG claimed a 15 percent markup on the applications to which it was not entitled.

Based on the State's investigation of these matters, CCG had been charged in a 45 count indictment with grand theft, rack-

eteering, and conspiracy to commit racketeering.

The Plea Agreement was entered on March 21, 1994. Pursuant to the Plea Agreement, CCG agreed to enter pleas of no contest to all of the counts of grand theft in the indictment, and the State agreed to nolle prosequi the racketeering and conspiracy charges. The conditions of the Plea Agreement include the following:

1. CCG agreed to pay restitution to the Fund in the total amount of $760,899.59. This total amount would be payable in installments commencing on the date that the Plea Agreement was accepted, with the final installment due on August 1, 1994.

2. CCG agreed to pay the sum of $101,000 representing the cost of the State's investigation. This total amount was allocated among the agencies involved in the investigation, and was payable in installments commencing on September 1, 1994, and continuing until March 1, 1996.

3. CCG agreed not to seek certain markups related to pending applications, and not to seek markups based on other transactions for which applications had not yet been filed. CCG and the State agreed that the total amount "foregone" or abandoned under this provision equalled $1,555,040.

4. CCG agreed to pay a fine in the amount of $1,000,000 to the Clerk of the Circuit Court of Hillsborough County, Florida. This total amount would be payable in installments commencing on September 1, 1994, with a final payment due on March 1, 1996.

5. CCG agreed to dismiss all administrative proceedings that it had initiated to challenge the rules governing the implementation of the Fund, and further agreed not to reinstitute any such proceedings based on the same or similar grounds.

6. CCG and the State agreed that the State was not precluded from pursuing penalties, restitution, costs, and other relief pertaining to applications or incidents other than the specific incidents identified in the indictment.

7. The State agreed that it would not pursue the criminal prosecution of CCG, the Debtor, three entities associated with CCG, and "any officers, directors, shareholders, employees, and agents" of the named entities. The agreement not to prosecute extended to "matters relating to the factual basis detailed in the Indictment and any matters presently under investigation."

The Plea Agreement also included certain provisions requiring CCG to make a public apology, requiring CCG and the Debtor to enter a voluntary ethics compliance review program, and providing for withdrawal from the Agreement in the event of breach by either party.

One-half of the payments required by the Plea Agreement were guaranteed by Dr. C. Warren Olanow, a major stockholder, and one-half were guaranteed by Mr. Jerald Richman, also a major stockholder.

Failure to make the payments required by the Plea Agreement would allow the State to withdraw from the agreement.

The Committee and the State filed a Joint Pretrial Statement in this adversary proceeding, which included a statement of admitted or uncontested facts. Pursuant to · these stipulated facts, the parties agreed that the Debtor made certain transfers of its property to the State or for the benefit of the State within one year prior to the filing of the bankruptcy petition, and made other transfers more than one year but less than two years prior to the petition. These transfers were made

in payment of the obligations of the Debtor set out in the Plea Agreement, and are set forth in a table identifying each payee, the payment date, and the amount of each payment.

| Payee | Payment date | Amount of Payment |
|---|---|---|
| Inland Protection Trust Fund (restitution) | 3–24–94 | $ 400,000.00 |
| | 4– 1–94 | $ 72,179.92 |
| | 5– 3–94 | $ 72,179.92 |
| | 5–31–94 | $ 72,179.92 |
| | 6–24–94 | $ 72,179.92 |
| | 7–29–94 | $ 72,179.92 |
| Hillsborough County Clerk of Court (fine) | 10– 4–94 | $ 52,631.58 |
| | 10– 4–94 | $ 52,631.58 |
| | 11– 1–94 | $ 52,631.58 |
| | 11– 9–94 | $ 842,125.26 |
| Department of Environmental Protection (costs) | 8–29–94 | $ 3,473.69 |
| | 10– 3–94 | $ 3,473.69 |
| | 10–31–94 | $ 3,473.69 |
| | 11–10–94 | $ 55,578.93 |
| Florida Dept. of Law Enforcement (costs) | 9–15–94 | $ 1,052.64 |
| | 9–30–94 | $ 1,052.64 |
| | 10–31–94 | $ 1,052.64 |
| | 11–14–94 | $ 16,842.08 |
| Office of the Statewide Prosecutor (costs) | 9– 8–94 | $ 789.48 |
| | 10–10–94 | $ 789.48 |
| | 11– 7–94 | $ 789.48 |
| | 11–21–94 | $ 12,631.56 |

The parties' statement of admitted facts also includes the following:

1. Pursuant to the Plea Agreement, the Debtor abandoned claims against the Fund totaling $1,555,040.

2. Pursuant to the Plea Agreement, the Office of Statewide Prosecution agreed not to pursue criminal prosecutions against fifteen individuals and entities. The individuals subject to the agreement not to prosecute are named in the Joint Pretrial Statement, and include stockholders and officers of CCG and the Debtor.

The table reflects that the Debtor paid the total amounts due under the Plea Agreement. The restitution ($760,899.59) was paid according to the schedule established in the Plea Agreement. The fine ($1,000,000) and the costs of investigation ($101,000) were not paid according to that schedule, however, but were paid in advance of the due dates. Specifically, the Debtor made the first three monthly payments according to the schedule, and then prepaid the balance of the amounts due under the Plea Agreement. In November, 1994, the Debtor prepaid a total of $927,177.83, although the only payments required by the agreement were monthly installments of $57,947.39 over the next 16 months.

On July 20, 1995, an involuntary petition under Chapter 7 was filed against the Debtor alleging that the Debtor was generally not paying its debts as they became due. Subsequently, the Debtor agreed to

relief under Chapter 11, and the Debtor is now liquidating in this Chapter 11 case.

The Court entered an Order Granting the Committee's Motion for Authority to File Adversary Proceeding Against State of Florida, which permitted the Committee to commence this action.

### Fraudulent Obligations and Transfers

Count I of the Committee's Amended Complaint is an action to recover fraudulent transfers pursuant to § 548(a)(2) of the Bankruptcy Code. That section provides:

**§ 548. Fraudulent transfers and obligations**

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Section 548 of the Bankruptcy Code addresses obligations incurred and transfers made on or within one year before the date of the filing of the petition.

Count II of the Committee's Amended Complaint is based on § 544 of the Bankruptcy Code and Florida Statutes § 726.105(1)(b) and § 726.106(1), and is to recover the value of property transferred pursuant to an obligation incurred more than one year and less than two years prior to the filing of the petition.

Section 544(b) authorizes the avoidance of any transfer of an interest of the debtor in property that is voidable under applicable laws, including state laws to void fraudulent transfers, by a creditor holding an allowable unsecured claim.

Florida's laws regarding the avoidance of constructively fraudulent transfers are set forth in Florida Statute § 726.105(1)(b) and Florida Statute § 726.106(1) Florida Statute § 726.105(1)(b) provides:

**726.105 Transfers fraudulent as to present and future creditors.**

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

. . .

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1. Was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2. Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Florida Statute § 726.106(1) provides:

**726.106 Transfers fraudulent as to present creditors.**

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

These Florida Statutes do not restrict the analysis of the obligations incurred or the transfers made to a period of only one year prior to the filing of a petition in bankruptcy, but provide that certain obligations incurred or transfers made are fraudulent as to creditors with claims which arose before the obligation or transfer, and that certain obligations incurred or transfers made are fraudulent as to creditors with claims which arose before or after the obligation or transfer.

In other material respects, Florida Statute § 726.105(1)(b) and Florida Statute § 726.106(1) are analogous "in form and substance" to § 548(a)(2) of the Bankruptcy Code. *In re United Energy Corp.*, 944 F.2d 589, 594 (9th Cir.1991) (Construing California's fraudulent transfer statutes, which are virtually identical to Florida's statutes).

■ Consequently, it is appropriate to analyze the similar provisions of the state statutes and § 548 of the Bankruptcy Code contemporaneously. *In re United Energy Corp.*, 944 F.2d at 594. See also *In re Spatz*, 209 B.R. 907 (Bankr.N.D.Ill.) and *In re Grigonis*, 208 B.R. 950, 958 (Bankr. D.Mont.1997), in which the courts found that the fraudulent transfer statutes of Illinois and Montana, which are based on the Uniform Fraudulent Transfer Act, resemble § 548 so closely that the provisions of both were considered simultaneously, and the courts' findings applied equally to both the state statutes and the federal statute. Florida's statutes are also based on the Uniform Fraudulent Transfer Act.

■ Clearly, in this case there are creditors with claims which arose before or after the obligations at issue were incurred or the transfers at issue were made.[1]

■ The test common to the Bankruptcy Code and each of the Florida statutes is whether the debtor received reasonably equivalent value in exchange for the obligation or transfers.

In this case, if the Debtor did not receive reasonably equivalent value in exchange for incurring the obligation, then the obligation and the transfers were possibly fraudulent, and the other tests of the statutes must be examined. If the Debtor received reasonably equivalent value in exchange for incurring the obligation, then the obligation was not fraudulent under any of the tests, and the transfers in satis-

---

1. Section 548 of the Bankruptcy Code does not apply to the incurring of the obligations represented in the Plea Agreement because the obligations were not incurred within one year before the date of the petition.

 Under section 544(b), the trustee may avoid a transfer made or an obligation incurred that is voidable under state law by a creditor with an allowable unsecured claim.

 For the obligation to be avoided pursuant to § 726.106, Fla.Stat., there must be a creditor with an allowable unsecured claim in this bankruptcy case which claim arose before the obligation was incurred. The parties have not indicated whether there is a creditor with an allowable unsecured claim in this bankruptcy case which claim arose before the obligation was incurred.

 Under § 726.105, Florida Statutes, however, the obligation may be fraudulent as to creditors whose claims arose before or after the obligation was incurred. There are creditors with allowable unsecured claims in this bankruptcy case which claims arose before or after the obligation was incurred.

faction of the obligation, while they may have been preferential, were not fraudulent.

■ To determine if the Debtor received reasonably equivalent value, the Court must first examine the obligation.

**The obligation.**

On March 21, 1994, the Debtor entered the Plea Agreement and incurred the obligation to pay a total of $1,861,899.59 in various installments over 24 months.

The Committee focuses principally on the sum of $1,000,000 paid by the Debtor to the Clerk of the Court of Hillsborough County as a fine in accordance with the Plea Agreement. The Committee contends that the Debtor did not receive reasonably equivalent value in exchange for the payment of the $1,000,000 fine, and that the absence of equivalent value is established by the following:

1. The Debtor otherwise compensated the Fund for the amount of the State's loss or the amount of the Debtor's gain by virtue of the restitution paid to the Fund in the amount of $760,899.59. In fact, the Committee contends that the restitution payment alone actually exceeds the amount of the State's pecuniary loss based on the State's own calculation of the overcharges attributed to each of the applications for reimbursement at issue. According to the State's computation, the total amount of the overcharges was approximately $380,000, and the Debtor paid the sum of $760,899.59 designated as restitution. Consequently, the Committee asserts that the Debtor not only overcompensated the State for any pecuniary loss, but also paid an additional $1,000,000 as a "fine" with no compensatory purpose.

2. The State did not provide the Debtor with a general release of all claims that it might have against the Debtor.

Instead, the Plea Agreement resolved only those claims arising from the specific applications listed in the indictment, and the State was free to pursue any claims that it asserted with respect to other applications or incidents.

3. Nondebtors, such as the individual officers, directors, and shareholders of the Debtor and related entities, received the key benefit from the Plea Agreement and payments thereunder, in that those individuals received an agreement from the State not to prosecute them criminally for their participation in submitting the applications for reimbursement. The Committee argues that such an agreement not to prosecute is of much greater significance to an individual than to a corporation, and that this promise may have provided the motivation to enter the Plea Agreement upon the expensive terms stated. The individuals who executed the Agreement on behalf of the Debtor, of course, are the same individuals who received the benefit of the agreement not to prosecute.

4. Although the Plea Agreement allowed the Debtor to pay the settlement amounts in installments through March of 1996, the Debtor actually paid the entire balance of the obligations by November of 1994. In fact, the fine and the obligation for the State's investigative costs were satisfied by making lump sum payments in November of 1994, in advance of the payment schedule contained in the Plea Agreement. As set forth above, the Plea Agreement provided that the State could withdraw from the Plea Agreement in the event of default by the Debtor. Apparently, therefore, the Committee contends that the accelerated payments are the result of the efforts by the individuals to secure their personal releases from criminal prosecution.

5. The terms of the Plea Agreement were so financially onerous, given the Debtor's financial condition, that the Debtor was destined to fail economically under its obligations. According to the Committee, the Plea Agreement was not designed to enable the Debtor to remain in business, and did not in fact facilitate the Debtor's continued operation. The Debtor did not receive any "value" in terms of its ability to continue to do business.

The State asserts that the Debtor did receive reasonably equivalent value in exchange for the transfers, because the Plea Agreement constituted a resolution of a forty-five count criminal indictment and allowed the Debtor to remain in business. The State contends that the resolution of a criminal indictment provides valuable consideration to a defendant in a criminal proceeding, even though the State acknowledges that it may be impossible to ascribe a specific value to the potential criminal litigation. According to the State, since the Plea Agreement previously was approved by the state circuit court, there already has been a judicial determination that the Agreement constitutes an "appropriate resolution" of the criminal charges, and that the resolution therefore constitutes "value" as a matter of law.

Neither party cited any case authority dealing squarely with the issue of whether obligations incurred or payments made in connection with the settlement of criminal charges are constructively fraudulent within the meaning of § 548(a)(2) of the Bankruptcy Code, and it appears that this issue may not have been addressed in any prior decisions.

In all of the cases which have been brought to the attention of the Court, resolution of civil litigation has uniformly constituted reasonably equivalent value. See *In re Pinto Trucking Service, Inc.*, 93 B.R.

379 (Bankr.E.D.Pa.1988); *In re the One Bancorp Securities Litigation*, 151 B.R. 1 (D.Me.1993). These cases do not consider the resolution of criminal litigation, however, and particularly do not address an agreement to pay a fine in addition to the payment of restitution and costs.

 The Eleventh Circuit Court of Appeals has expressed the following considerations regarding reasonably equivalent value in the context of fraudulent transfers.

> The purpose of voiding transfers unsupported by "reasonably equivalent value" is to protect creditors against the depletion of a bankrupt's estate. 11 U.S.C. § 548(a)(2); *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829–30 (5th Cir.1959), cert. denied, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960). Therefore, this provision does not authorize voiding a transfer which "confers an economic benefit upon the debtor," either directly or indirectly. *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991, (2d Cir.1981). (Footnote omitted.) In such a situation, "the debtor's net worth has been preserved," and the interests of the creditors will not have been injured by the transfer. *Id.*

*In re Rodriguez, General Electric Credit Corporation of Tennessee v. Murphy*, 895 F.2d 725, 727 (11th Cir.1990).

 In a different context, the Third Circuit Court of Appeals provided a thorough analysis of the term "reasonably equivalent value," as contained in § 548(a)(2), in *In re R.M.L., Inc.*, 92 F.3d 139 (3d Cir.1996). In that case, the Court encountered the issue of whether a debtor had received reasonably equivalent value in exchange for commitment fees paid to a bank with respect to a loan that never closed. The Court acknowledged that the concept of "reasonably equivalent value" is

not defined in the Bankruptcy Code, and further acknowledged that the absence of such a definition creates particular difficulties where, as in the case under consideration, the debtor exchanges cash for intangibles. *R.M.L., Inc.*, 92 F.3d at 148. In such instances, a two-step analysis is appropriate.

First, the court must determine whether the debtor received any value at all in exchange for the transfer. The inquiry in the first step of the analysis is whether the debtor obtained "any benefit ... whether direct or indirect, without regard to the cost of ... services, the contractual and arm's length nature of the relationship, and the good faith of the transferee." *Id.* at 150. According to the Third Circuit Court of Appeals, this determination involves whether the debtor received any "realizable commercial value" as a result of the transaction. *Id.* at 149, citing *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646–47 (3d Cir.1991), cert. denied, 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992). While not restricting the definition of value, since the issue in *R.M.L.* involved whether value was received in exchange for the fees for a contingent commitment to make a loan, the court held that "the mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the Code." *In re R.M.L.*, 92 F.3d at 148. In that case, the Third Circuit focused on whether the debtor received "at least some chance of receiving a future economic benefit" or, in other words, whether the debtor received "some chance" that the transfer would generate a positive return. *Id.* at 150–52.

Second, if it is determined that "value" was in fact conferred on the debtor as a result of the transaction, the court must then determine whether that value was reasonably equivalent to the cash transferred by the debtor. In making this assessment, the court may apply a "totality of the circumstances" test. *Id.* at 153. The totality of the circumstances test includes the consideration of a variety of factors, such as the fair market value of the item or service received compared to the price paid, the arms-length nature of the transaction, and the good faith of the transferee. *Id.* at 150.

In *R.M.L., Inc.*, the Third Circuit Court of Appeals concluded that the debtor in that case did receive "value" in exchange for the fees paid in connection with the loan commitment letter, even though the loan never closed, because there was "at least some chance" at the time of payment that the loan could be concluded and the debtor's financial troubles could be resolved. *Id.* The Third Circuit also found, however, that the chance that the loan would close was negligible, and that the debtor's opportunity to receive value in the future as a result of the transaction was "extremely remote." *Id.* at 148. These findings were based on the fact that the commitment letter contained so many conditions, including the condition of a significant equity investment by a third party, that there was little possibility that the debtor would ever actually obtain the loan sought. *Id.* at 154. The Third Circuit therefore upheld the bankruptcy court's determination that the minimal value associated with the opportunity to obtain the loan was not "reasonably equivalent" to the commitment fees that the debtor had paid to the bank.

### a. "Value"

■■■ In this case, of course, the central issue is whether the resolution of the criminal charges contained in the indictment conferred "value" on the Debtor that was "reasonably equivalent" to the obligation incurred and the payments made by the Debtor pursuant to the Plea Agreement.

In applying the first step of the two-step approach set forth by the Third Circuit Court of Appeals, the Court concludes that the Debtor did receive "value" when it incurred the obligations of the Plea Agreement, and also when it made the transfers in payment of those obligations.

The value received when the obligations were incurred is found in the resolution of the charges in the indictment. This resolution entailed at least (1) resolving the risk of incurring the substantial liabilities associated with the indictment, (2) avoiding the substantial costs associated with litigation of 45 felony charges, and (3) the possibility that the terms of the Plea Agreement, viewed at the time that the Agreement was entered, could have enabled the Debtor to receive an economic benefit in the future. Value was received for the payments pursuant to the Plea Agreement because they were in satisfaction of the obligations which had been incurred, which is defined as value by § 548(d)(2)(a).

The focus of the Third Circuit Court of Appeals in *R.M.L., Inc.* in determining value was whether the debtor received any benefit, direct or indirect.[2] Because the commitment letter in that case had no immediate direct benefit, the Third Circuit then focused on the chance of obtaining any substantial economic benefit in the future.

In this case, the Plea Agreement resulted in both immediate direct benefit and the opportunity to obtain future economic benefit. The Plea Agreement resolved the charges in the indictment, which represented substantial disputed debts, allowed the Debtor to avoid future costs associated

with the defense of 45 felony charges, allowed the Debtor to pay a substantial portion of the settlement amount in installments, and also provided that the State agreed not to pursue the racketeering and conspiracy charges. The Court concludes that resolution of the substantial charges in the indictment resulted in direct benefit. Further, since the provision for satisfaction of the liability in installments may have benefitted the Debtor by giving it the time and opportunity to make financial arrangements for payment or to make payments from operations, the Court determines that the Debtor received some chance of a future economic benefit from the settlement. Given the resolution of substantial disputed debts, as well as the chance of future economic benefit, the Court concludes that the Debtor received value in exchange for its obligations and payments pursuant to the Plea Agreement.

### b. "Reasonably equivalent"

Having concluded that the Debtor received some value in the transaction, the Court must determine whether that value was reasonably equivalent to the obligations incurred or the amounts transferred by the Debtor.

As set forth by the Third Circuit Court of Appeals, this second step of the two-step analysis requires application of the "totality of the circumstances" test. As stated above, three factors sometimes considered under this test include the fair market value of the item or service provided, the arms-length nature of the transaction, and the good faith of the transferee. *In re R.M.L., Inc.*, 92 F.3d at 150.

---

**2.** "To determine whether this threshold requirement was satisfied, the court should have examined whether Intershoe received any benefit from the commitment letter, whether direct or indirect, without regard to the cost of Mellon Bank's services, the contractual and arm's-length nature of the relationship, and the good faith of the transferee." *In re R.M.L., Inc.*, 92 F.3d at 150.

Although the settlement of the criminal charges did not provide an item or service with market value, its general economic value can be assessed by considering the obligations which the Debtor faced if convicted of the criminal charges, the risk of conviction, and the costs of defense.[3]

If convicted of the criminal charges, the Debtor could have been required to make restitution (Fla.Stat. § 775.089) and pay the costs of investigation and prosecution (Fla.Stat. § 939.01 (1991), now § 938.27(1997), and § 812.032). In the Plea Agreement, the Debtor agreed to pay restitution plus interest, and agreed to pay the costs of investigation.

The Committee does not assert that the Debtor did not receive reasonably equivalent value in exchange for the restitution or reimbursement obligations. The Committee does indicate that the actual amount of the overcharges asserted by the State, based on the State's own breakdown of specific reimbursement applications, totaled $381,169.98. However, the Plea Agreement is clear that the Debtor agreed that the restitution amount represented the repayment of funds improperly received plus interest. The reimbursement obligations are to reimburse the Department of Environmental Protection, the Florida Department of Law Enforcement, and the Office of the Statewide Prosecutor for the costs of their investigations.

The focus of the Committee's objection is whether the Debtor received reasonably equivalent value when it became obligated for the fine, and when it made the transfers in payment of the fine.

The Plea Agreement indicates that the minimum fines were $5,000 for each of 41 counts of grand theft third degree, $10,000 for each of 2 counts of grand theft second degree, $10,000 for the count of racketeering, and $10,000 for the count of conspiracy to commit racketeering. Therefore, the total minimum fine which the Debtor faced was $245,000. The Plea Agreement indicates that the maximum fines for the theft charges were double the pecuniary gains derived from the offense or double the pecuniary losses suffered by the victim. The Committee indicates that the alleged pecuniary gains to the Debtor which relate to the theft counts were $381,169.98.[4] Based on this, the maximum exposure with respect to the 43 theft counts was $762,339.96. The Plea Agreement further indicates that the maximum fine for the charge of Racketeering was a fine of up to three times the gross value gained by the offender or three times the gross loss of the victim, and the maximum fine for the charge of Conspiracy to Commit Racketeering was also three times the gross value gained by the offender or three times the gross loss of the victim. Using $381,339.96 as the value gained by the offender, the Debtor faced fines of up to $1,143,509.90 for each of these counts. It appears that the maximum fines for all of

---

3. At least one case suggests that an evaluation of ultimate liability in civil litigation need not be considered if the claim is not groundless. In *In re Pinto Trucking Service, Inc.*, 93 B.R. 379, 389 (Bankr.E.D.Pa.1988), the court stated:

> There is no question that the compromise of a dispute can supply the element of consideration in a contract. (Citations omitted.) While it is true that a totally groundless claim or a non-dispute may not constitute consideration, [citations omitted] the courts

will not look at the underlying merits of a compromise very critically to determine its worth. The sufficiency of the consideration for a compromise is not to be determined by the soundness of the original claim of either party. The very object of compromise is to avoid the risk or trouble of that question.' [citation omitted.]

4. See Committee's Motion for Summary Judgment, ¶ 7.

the counts, therefore, was $3,049,359.78. It further appears that Fla.Stat. § 812.035(1) empowers the State criminal court to restrict or terminate a business enterprise in the event of a conviction under Fla.Stat. § 812.014.

It appears that the Debtor faced a realistic risk of conviction. The Debtor acknowledges in the Plea Agreement that it made misrepresentations with the specific purpose of receiving funds to which it was not entitled.[5] In addition, in the Plea Agreement the Debtor acknowledges that it claimed second-tier fifteen percent mark-ups which it did not have the right to claim.[6] In Florida,

[a] person[7] commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:

(a) Deprive the other person of a right to the property or a benefit from the property.

(b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

Florida Statutes, § 812.014. The acknowledgments by the Debtor are acknowledgments of actions which are defined as theft under Florida law. Moreover, when approving the Plea Agreement, the State criminal court found that there was a factual basis for the plea. It therefore appears that the Debtor faced a realistic risk of conviction.

To resolve the realistic risk of conviction and the resulting substantial liabilities, the Debtor entered the agreement on March 21, 1994, which obligated it to pay restitution plus interest ($760,899.59), the costs of investigation ($101,000), and a fine ($1, 000, 000). Additionally, the Plea Agreement allowed the Debtor to pay the restitution, costs, and fine in installments over a period of 24 months.

Further, by settling the charges, the Debtor also would not be required to expend the time, costs, and attorneys fees which would be required in defending the charges. These have not been quantified, but they would be substantial.[8]

The Plea Agreement was an arms-length agreement. There is no allegation or indication of collusion between the Debtor and the State. Additionally, Rule 3.172, Florida Rules of Criminal Procedure, provides that a State trial judge must have certain assurances before accepting a plea of nolo contendere. Before accepting such a plea, the state trial judge must be satisfied that the plea is voluntary and that there is a factual basis for it. Additionally, the trial judge should determine that the defendant understands the complete terms of any plea agreement, including specifically all obligations the defendant will incur as a result. Further, before the trial judge accepts a nolo contendere plea, the judge must determine that the defendant either acknowledges his or her guilt or acknowledges that he or she

---

5. "The misrepresentation that PACO had been paid was made with the specific purpose of receiving funds to which CCG was not entitled from the IPTF." Plea Agreement, ¶ 3.

6. "At all times and places relevant to the counts charged in the Indictment, the State can show that CCG and PACO were related companies, and that CCG therefore did not have the right to claim the second-tier fifteen (15) percent mark-up which it claimed in

these forty-three instances." Plea Agreement, ¶ 3.

7. The term "person" includes a corporation. Florida Statutes § 1.01(3).

8. The Court notes that the State's costs of investigation alone, which the Debtor agreed to pay in the Plea Agreement, totaled $101,000.

feels the plea to be in his or her best interest, while maintaining his or her innocence. No plea negotiation is binding until it is accepted by the trial judge formally after making all the inquiries, advisements, and determinations required by Rule 3.172, Fla.R.Crim.P. The Plea Agreement was accepted in this case.

The Committee argues that the State knew that the Debtor was in a weak financial position and not able to defend itself, that the State knew that the terms of the Plea Agreement would cause the Debtor to fail financially, and that the State therefore did not act in good faith in negotiating the Agreement. However, the Debtor paid $400,000 upon entering the Plea Agreement, and paid the entire $1.86 million within eight months after entering the agreement, and it therefore appears that the Debtor had the financial ability to defend itself. Additionally, the obligations in the Plea Agreement correlate to the amounts for restitution and costs, and the fine falls within the range between the minimum and the maximum fines for the charges. Further, for the trial judge to have accepted the plea of nolo contendere, the defendant must either have acknowledged its guilt or acknowledged that it believed the plea to be in its best interest while maintaining its innocence. The Plea Agreement both compromised the realistic risk of having to pay substantial fines, and allowed the Debtor to pay the amounts in installments.

There may be instances in the context of criminal litigation where fines, penalties, or forfeitures are imposed with respect to which a debtor does not receive reasonably equivalent value. However, in this case, considering the factors discussed above, the Court concludes that the Debtor received reasonably equivalent value in exchange for entering the Plea Agreement and incurring the obligations.

**The transfers.**

 Value includes the satisfaction of a present or antecedent debt of the debtor.[9]

 Clearly, the transfers of cash which were made in payment of the installments as they became due according to the Plea Agreement were made for reasonably equivalent value since they were made in satisfaction of an antecedent debt of equal value.

 A question arises, however, regarding the prepayments which were made in November of 1994. The amounts were not due at the time, interest was not accruing, and there was no discount for prepayment. Part of the value of the Plea Agreement was that the amounts were to be paid in installments. Payments under the Plea Agreement were personally guaranteed by two of the major stockholders of the Debtor. Additionally, if the obligations under the Plea Agreement were not met, the State could withdraw from the agreement and pursue criminal prosecution of the individuals and other entities involved in the indictment, as well as the Debtor. Accordingly, it appears that one of the reasons for the prepayments was to benefit the individuals and other entities involved in the indictment.

The fact that the obligation and the transfers may have benefitted third parties as well as the Debtor does not require the Court to conclude that the obligation and transfers were not incurred or made by the Debtor for reasonably equivalent value. *Chase & Sanborn Corporation, Nordberg v. Arab Banking Corporation,* 904 F.2d 588 (11th Cir.1990). The Court has analyzed the obligation as it relates to the Debtor, and has concluded that it was

---

**9.** 11 U.S.C. § 548(d)(2).

incurred by the Debtor for reasonably equivalent value.

The installment obligations which were prepaid, although not mature, constituted an antecedent debt. "Cancellation of future indebtedness to accrue under a court order for support has been held correctly to be a good and valuable consideration for a transfer." Lawrence P. King, Collier on Bankruptcy ¶ 548.05[1][b], (15th ed.1998), citing *In re Ottaviano*, 63 B.R. 338 (Bankr. D.Conn.1986); and *Page v. Corn Exch. Nat'l Bank & Trust Co.*, 314 Pa. 411, 171 A. 560 (1934).[10]

The satisfaction of the antecedent debt in return for the transfer of cash in an equal amount constituted reasonably equivalent value. While such a transfer might be preferential, it is not fraudulent or constructively fraudulent.

> An antecedent debt is fair consideration [11] for a conveyance. [Citation omitted.] And a debtor may pay such a debt, even with all his property, and as to creditors it would be nothing more than the creation of a preference of one of them, not to be reached in this kind of proceeding [a fraudulent conveyance proceeding].

*Merchants' Bank v. Page*, 147 Md. 607, 128 A. 272 (1925).

The Court also concludes that these prepayments were not fraudulent for other reasons. The payments were made in resolution of the realistic risk of substantial liabilities. Default in the payments would allow the State to withdraw from the agreement and pursue the criminal prosecution of the Debtor. The risk of conviction was realistic. Defending the charges would be time consuming and expensive. The resolution was in the range between the minimum liabilities and the maximum liabilities realistically faced by the Debtor. A substantial portion of the liability had already been paid. There is no indication that the State had any influence on the decision to prepay, so there is no indication of bad faith on the part of the State. Finally, after paying the amounts, the Debtor continued to operate.

For these reasons, the Court concludes that the Debtor received reasonably equivalent value in exchange for incurring the obligations of the Plea Agreement, and for making the transfers in payment of the amounts required by the Plea Agreement. Accordingly, the Debtor's motion for summary judgment should be denied, and summary judgment should be granted in favor of the State on Counts I and II of the Amended Complaint.

**10.** In considering the concept of an antecedent debt for the purposes of § 547, installments which are not yet due are nevertheless antecedent debts. "Although 'antecedent debt' is not defined by the Code, a debt is 'antecedent' if it is incurred before the transfer; the debt must have preceded the transfer." Collier, *supra*, ¶ 547.03[4]. "For purposes of Section 547, an installment loan is not considered a new debt as each installment becomes due, but the entire debt is deemed to have been incurred on the date of the original loan." *In re Anders, Grant v. Jacksonville Postal Credit Union*, 20 B.R. 468, 469 (Bankr. M.D.Fla.1982).

**11.** Case law applying the concept of "fair consideration" under the Bankruptcy Act of 1898 has been considered by the Eleventh Circuit Court of Appeals as applicable to the concept of "reasonably equivalent value" under the current Bankruptcy Code of 1978. *In re Chase & Sanborn Corporation, Nordberg v. Arab Banking Corporation*, 904 F.2d 588, 593 n. 11 (11th Cir.1990); see also *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir.1990). The case cited in this opinion is a Maryland State Court of Appeals case applying the Fraudulent Conveyance Act of 1920 in Maryland, which also considered the concept of "fair consideration."

## Equitable Subordination

Count III of the Amended Complaint is an action for equitable subordination of the State's claim pursuant to § 510 of the Bankruptcy Code. Section 510(c) of the Bankruptcy Code provides:

### § 510. Subordination

. . .

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

The Eleventh Circuit Court of Appeals has explained § 510(c) as follows:

Title 11 U.S.C.A. § 510(c) adopts the long-standing judicially developed doctrine of equitable subordination under which a bankruptcy court has power to subordinate claims against the debtor's estate to claims it finds ethically superior under the circumstances.

*In re Lemco Gypsum, Inc.*, 911 F.2d 1553, 1556 (11th Cir.1990). The Eleventh Circuit then identified three elements that must be established before a claim should be equitably subordinated:

(1) The claimant must have engaged in some type of inequitable conduct,

(2) The misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant,

(3) Subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In re Lemco*, 911 F.2d at 1556. Further, if the claimant is not an insider or fiduciary of the debtor, the party seeking subordination must prove egregious conduct such as fraud, spoilation, or overreaching on the part of the claimant, and such conduct must be proven with particularity. *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986).

In this case, the Committee alleged that the State engaged in inequitable conduct which harmed the unsecured creditors of the estate. The specific conduct alleged includes (1) suspending various programs which were integral to the Debtor's business; (2) threatening the Debtor with criminal sanctions for the purpose of obtaining money from the Debtor; (3) obtaining large sums of money from the Debtor with the knowledge that the Debtor's business was in financial distress; and (4) filing an audit claim in the chapter 11 case "which is based on theories contrary to Florida law and prior procedures."

The Committee did not seek the entry of a summary judgment as to Count III of the Amended Complaint. The State, however, seeks the entry of a summary judgment in its favor that equitable subordination is not warranted in this case, and contends that the allegations made by the Committee, even if true, do not approach the level of inequitable conduct necessary to subordinate its claim. No affidavit or other supporting documentation was filed with the State's initial motion.

The Committee filed a response to the State's motion and asserted that the record in this case shows the State's inequitable conduct by virtue of the following: (1) State employees invoked their Fifth Amendment privilege in matters pertaining to the Debtor, from which the Court may infer that the employees participated in criminal conduct; (2) the State knew that the Plea Agreement would render the Debtor insolvent, as shown by financial statements that were in the State's possession; and (3) the State overreached and

took advantage of the Debtor with knowledge of the Debtor's weakened financial condition, as shown by an Affidavit of the president of the Debtor.

The State subsequently filed a Motion to Allow Supplementation of Record Regarding Inequitable Conduct. The Motion relates solely to the Committee's claim that an adverse inference may be drawn from a State employee's invocation of the Fifth Amendment privilege against self-incrimination. Attached to the Motion is a copy of an Order on Motion to Compel and Official Notice entered by the State of Florida, Division of Administrative Hearings, which found that the employee's assertion of the privilege appeared to based exclusively on her fear that her testimony might violate a court Order Sealing Affidavit for Search Warrant, and that her invocation of the privilege was not the result of her conduct in the performance of her job.

In view of the record, the Court finds that issues of fact exist as to whether the State's claim should be equitably subordinated pursuant to § 510(c) of the Bankruptcy Code. In *In re Jarax International, Inc.*, 164 B.R. 180, 187 (Bankr.S.D.Fla. 1993), the court denied summary judgment as to a claim under § 510(c):

> In reviewing the record, it is unclear as to whether the Defendants have engaged in the inequitable conduct necessary to meet the first prong of the Lemco test. While the Trustee alleges in her Second Amended Complaint that the Defendants have engaged in fraudulent conduct, this Court finds that the facts supporting these allegations are entirely in dispute.

Likewise, in this case the Court determines that the facts alleged by the parties are in dispute, as shown above, and that the State's Motion for Summary Judgment as to Count III of the Amended Complaint should be denied.

## Disallowance of Claim

Count IV of the Amended Complaint is an action for disallowance of the State's claim pursuant to § 502(d) of the Bankruptcy Code. Section 502(d) of the Bankruptcy Code provides:

### § 502. Allowance of claims or interests

. . .

(d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

The Court has determined that the obligations and transfers that are the subject of Count I and Count II of the Amended Complaint are not avoidable. Consequently, the State's claim should not be disallowed pursuant to § 502(d), and the Committee's Motion for Summary Judgment should be denied as to Count IV of the Amended Complaint.

Accordingly, for the reasons expressed above;

**IT IS ORDERED** that:

1. The Motion for Summary Judgment filed by the Official Committee of Unsecured Creditors is denied.

2. The Motion for Summary Judgment filed by the Defendant, the State of Florida, is granted as to Count I, Count II, and Count IV of the Amended Complaint.

3. The Motion for Summary Judgment filed by the Defendant, the State of Florida, is denied as to Count III of the Amended Complaint.

4. A separate Partial Summary Judgment shall be entered consistent with this opinion.