T.C. Memo. 2015-51

UNITED STATES TAX COURT

WILLIAM J. KARDASH, SR., TRANSFEREE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

CHARLES K. ROBB, TRANSFEREE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12681-10, 12703-10.     Filed March 18, 2015.

Erica G. Pless, for petitioner in docket No. 12681-10.

Mitchell I. Horowitz and Quian Wang, for petitioner in docket No. 12703-10.

Timothy L. Smith, Andrew Michael Tiktin, Sergio Garcia-Pages, and Michael S. Kramarz, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge: This case involves the minority shareholders of a concrete company that earned large profits during the Florida housing boom in the early 2000s. From 2003 to 2007 petitioners received multiple transfers from the

[*2] company, in which they were minority shareholders. During that period the company paid no Federal income tax, and its majority shareholders siphoned substantially all of the cash out of the company. Respondent determined deficiencies, penalties, and interest with respect to the company for that period totaling more than $120 million, but the company cannot pay the liability. Respondent seeks to recoup approximately $5 million that petitioners received from the company during the period, under section 6901.[1] We must determine whether petitioners are liable as transferees. We hold that they are partially liable.

FINDINGS OF FACT

Some facts have been stipulated and are so found. Petitioners resided in Florida when they filed their petitions. We have consolidated their cases for trial, briefing, and decision.

I. Background

Florida Engineered Construction Products Corp. (FECP) makes precast concrete products often used in home construction. During the years at issue four individuals owned all of FECP's stock: petitioner Kardash owned 8.65%, petitioner Robb owned 1.13% (not until 2004), and FECP's president, John

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] Stanton, and its board chairman, Ralph Hughes, owned equal shares of the remainder.

Messrs. Stanton and Hughes were involved in all aspects of FECP's business, and as the majority shareholders they controlled the direction and management of the company. Mr. Kardash is an engineer and was primarily involved in FECP's operations. He was responsible for the company's processes and production decisions. Mr. Robb managed the company's sales team; because of Mr. Robb, FECP was able to retain many of its customers even as it raised the prices for its products. Neither petitioner was involved in the company's financial matters.

II. Tax Liability

A. Underlying Liability

Demand for precast concrete construction products corresponds with demand for new home construction. Consequently, during the Florida housing boom in the early 2000s FECP experienced a period of growth and profitability. Its annual revenues peaked in 2006 at more than $100 million. FECP failed to report any income for the years at issue. Ultimately the Internal Revenue Service (IRS) audited FECP and determined that it owed over $120 million in tax, penalties, and interest for the years at issue.

**[\*4]** Respondent tried to collect FECP's liability but found that FECP could not pay. Respondent agreed to let FECP pay its liability in $70,000 monthly installments. The installment plan agreement did not reduce the total liability. Under the agreement respondent reviews FECP's financial condition every two years and may increase the monthly obligation if he finds FECP can pay more.

### B. Respondent's Attempts To Collect From Petitioners

If FECP's current obligation under the installment agreement remains the same, FECP will take more than 150 years to pay off its full liability. In the meantime respondent is seeking to collect as much of the liability as he can from other parties. Respondent has already reached agreements with Mr. Hughes' estate and with Mr. Stanton to recoup some of the transfers they received during the years to which the liability relates. Respondent now seeks to recover many of the transfers petitioners received. Specifically, respondent seeks to recover from petitioners the following amounts:

Amounts

| Year | Mr. Kardash | Mr. Robb |
|------|-------------|----------|
| 2003 | $250,000 | $250,000 |
| 2004 | 300,000 | 200,000 |
| 2005 | 1,549,990 | 199,890 |

| [*5] | 2006 | 1,955,000 | 255,000 |
|------|------|-----------|---------|
|      | 2007 | 57,500 | 7,500 |
|      | Total | 4,112,490 | 912,390 |

## III. Fraud at FECP

Until 2001 FECP was subject to a line of credit agreement that required it to produce an audited financial statement each year. FECP had annual audits and consistently received unqualified opinions on its financial statements. FECP paid off the line of credit in 2001 and did not have a financial statement audit thereafter. About this time Messrs. Hughes and Stanton began to systematically transfer all of the company's pretax profits to themselves.

Mr. Stanton opened a bank account in FECP's name that did not appear on its balance sheet. As FECP received payment for services, Mr. Stanton would transfer cash from the company's operating account to this secret account. He would then transfer the money from the secret account to his and Mr. Hughes' personal accounts or to the accounts of corporations he solely owned. When accounting personnel asked Mr. Stanton how to characterize the large transfers from the company's operating account, he told them to mind their own business. The accounting staff recorded the amounts as loans receivable and eventually wrote them off as operating expenses.

[*6]  While Messrs. Hughes and Stanton were transferring money from the company, they also made sure that FECP did not file accurate income tax returns. FECP filed returns for 2003 and 2004, but it fraudulently reported losses.  FECP did not file a return for 2005, 2006, or 2007.  When the IRS audited FECP, it determined that FECP owed tax, penalties, and interest for the period of more than $120 million.

## IV.  Fictitious Interest Payments

In addition to the dividends they received, Messrs. Hughes and Stanton received interest payments from FECP in 2005, 2006, and 2007.  Mr. Hughes received $5,147,250, $12,914,047, and $6,468,750, respectively, through Denouement Strategies, Inc. (Denouement), a corporation he owned for personal and business investments.  Mr. Stanton received $4,250,001, $12,101,562, and $9,046,872, respectively.  The interest was based on a fictitious loan Mr. Stanton had recorded on the company's balance sheet in the names of Mr. Hughes and Denouement; neither Mr. Hughes nor Mr. Stanton, through Denouement, ever made the loans to FECP.

These interest payments were separate from the dividend payments all four shareholders received.  Neither petitioner received any interest payments from FECP.

**[*7]** V.  <u>Transfers to Petitioners</u>

Petitioners received several transfers during the years in which Messrs. Hughes and Stanton stripped FECP.  They received their usual salaries, which respondent is not seeking to recoup, and they received "advances" and dividends, which are the subject of this case.

A.  <u>Advances</u>

Until 2003 FECP had a bonus program, under which petitioners each earned significant compensation.  Their bonuses depended on their performance, and petitioners routinely received hundreds of thousands of dollars of additional income under the program.  FECP suspended the bonus program for 2003 and 2004.  Because Messrs. Hughes and Stanton understood that petitioners had become accustomed to receiving significant bonuses, they decided to give them bonus "advances" in 2003 and 2004.  The advances would allow petitioners to continue their standards of living while the bonus program was suspended.  When petitioners asked Mr. Stanton how they should report the advances on their returns, he told them that they were loans and did not have to be reported.  Mr. Stanton told petitioners that they would eventually have to repay the advances.  Petitioners did not sign a loan agreement or discuss further terms with Mr.

[*8] Stanton, and they never paid interest on the loans.  FECP ultimately forgave the loans in 2009.

The IRS audited petitioners' 2003 and 2004 individual Federal income tax returns and recharacterized the advances as dividends.  Petitioners claimed, in separate petitions they filed with this Court, that the payments were loans.  The cases eventually settled, and petitioners paid tax on the advances.

B.  Dividends

In 2005, 2006, and 2007 FECP declared and paid dividends to its shareholders in total amounts of $17,748,880, $22,610,000, and $665,000, respectively.  Each shareholder's dividends were based on his percentage of stock ownership.  Mr. Kardash received $1,549,990, $1,955,000, and $57,500, respectively; Mr. Robb received $199,890, $255,000, and $7,500, respectively.  FECP issued petitioners Forms 1099-DIV, Dividends and Distributions, reflecting these amounts, and petitioners reported these amounts as dividends on their individual returns.

[*9] VI.  FECP's Financial Condition

FECP's revenues for the years at issue and the four preceding years are summarized below:[2]

|       | Revenue        |
| Year  | (in millions)  |
|-------|----------------|
| 1999  | $39.9          |
| 2000  | 55.2           |
| 2001  | 45.6           |
| 2002  | 46.7           |
| 2003  | 64.2           |
| 2004  | 96.6           |
| 2005  | 132.2          |
| 2006  | 120.4          |
| 2007  | 55.4           |

These numbers reflect the significant growth FECP experienced during Florida's housing boom and also the drop in its revenues when the housing market collapsed.  Petitioners believed they were sharing in FECP's success when they received large dividends in 2005 and 2006.  In 2007 they felt the impact of the collapse through smaller dividends.

Until 2007 FECP was, at least ostensibly, a thriving business, but by the end of 2007 it had become insolvent.  Because Messrs. Hughes and Stanton hid a

---

[2]The revenues for 1999 to 2002 are based on FECP's Federal income tax returns for those years, and the revenues for the years at issue are based on internal financial statements the company prepared.

[*10] number of transfers from FECP's accounting personnel, FECP's financial statements do not reliably indicate when FECP became insolvent. Messrs. Hughes and Stanton left enough cash in the company to allow it to pay its usual creditors on time. However, FECP did not pay its Federal or State income tax during the period, and its tax liabilities continued to grow. The following table summarizes FECP's liability for Federal and State income tax, penalties, and interest during the period:[3]

| Year | Liability (in millions) |
|------|--------------------------|
| 2003 | $12.6 |
| 2004 | 27.5 |
| 2005 | 56.7 |
| 2006 | 100.9 |
| 2007 | 137.3 |

Petitioners and respondent have both presented expert witness testimony and reports to try to establish when FECP became insolvent.

A.  Respondent's Expert

Respondent hired Israel Shaked to evaluate FECP's solvency during the years at issue. Dr. Shaked determined that the "asset accumulation approach" was the most appropriate method for valuing FECP's assets. Under that approach Dr.

---

[3]Tax liability rounded to nearest $0.1 million.

**[*11]** Shaked valued FECP at the price at which a willing buyer would purchase the company's tangible assets and land. Any buyer, Dr. Shaked contends, would insist on reviewing FECP's tax returns and audited financial statements before purchasing the company. Because FECP could not have produced either, Dr. Shaked claims that no buyer would have been willing to pay more than the value of FECP's tangible assets and land. Dr. Shaked also noted in his report that he did not believe FECP had any intangible assets of value.

Dr. Shaked valued FECP's assets using a 2006 appraisal of the assets the company then possessed. The appraisal indicated that the fair market value of FECP's assets on the date of the appraisal represented 102% of the undepreciated book value of FECP's property, plant, and equipment. He used this multiplier to estimate the fair market value of FECP's assets on other dates during the years at issue. He simply applied the multiplier to the book value of FECP's assets on each valuation date. Using this method Dr. Shaked determined that FECP was insolvent at all times during the years at issue.

Although he determined that the asset accumulation approach was the most appropriate valuation method, Dr. Shaked also valued FECP's assets under the

**[*12]** "market approach".[4]   Under the market approach, the appraiser determines the value of a company by comparing it to similar companies that have recently been sold.

Under the market approach, buyers usually use ratios to estimate the value of a target company.  Dr. Shaked valued FECP using the revenue-to-sale-price ratio because according to him that is what most buyers use.  First, Dr. Shaked calculated the ratio of sale price to revenue for the comparable companies.  Then, he applied that ratio to FECP's revenues to estimate its value.

To perform his analysis, Dr. Shaked chose 13 sales of companies similar to FECP.  He adjusted each comparable company's sale price to account for FECP's financial mismanagement and also applied a 25% key man discount.  He then divided the five-year average of each company's revenues by its sale price.  The median revenue-to-sale-price ratio for his sample was 0.9.  Dr. Shaked applied this ratio to FECP's average revenue for the five-year periods ending on each valuation date.  The following table summarizes his conclusions:

---

[4]Dr. Shaked noted that the discounted cashflow method is another popular valuation approach.  He did not value the company under this approach because FECP could not provide reliable historical cashflow information from which to project future cashflows.  Consequently, he claims, no prospective buyer would use the discounted cashflow method to value FECP.

**[*13]**

| Valuation date | FECP revenue | Median adjusted multiple | Operating asset value | Plus: Cash on hand | Business enterprise value |
|---|---|---|---|---|---|
| 12/28/2005 | $61,887,997 | 0.9 | $56,064,399 | $1,247,206 | $57,311,606 |
| 1/27/2006 | 61,887,997 | 0.9 | 56,026,851 | 1,274,387 | 57,301,237 |
| 2/22/2006 | 61,887,997 | 0.9 | 56,026,851 | 1,274,387 | 57,301,237 |
| 3/27/2006 | 61,887,997 | 0.9 | 56,064,399 | 1,274,387 | 57,338,786 |
| 4/24/2006 | 61,887,997 | 0.9 | 56,026,851 | 1,274,387 | 57,301,237 |
| 5/22/2006 | 61,887,997 | 0.9 | 55,823,008 | 1,274,387 | 57,097,395 |
| 6/28/2006 | 61,887,997 | 0.9 | 55,619,166 | 1,274,387 | 56,893,553 |
| 9/25/2006 | 61,887,997 | 0.9 | 56,026,851 | 1,274,387 | 57,301,237 |
| 12/8/2006 | 61,887,997 | 0.9 | 54,896,395 | 1,274,387 | 56,170,782 |
| 3/23/2007 | 61,887,997 | 0.9 | 53,765,940 | 1,808,061 | 55,574,001 |

Using the market approach, Dr. Shaked found that the fair market value of FECP's assets was less than the value of its income tax liabilities, penalties, and interest as of January 27, 2006, resulting in insolvency. Dr. Shaked concluded FECP remained insolvent through March 23, 2007.

B. Petitioners' Expert

Petitioners hired Stanley A. Murphy to evaluate FECP's solvency during the years at issue. Mr. Murphy calculated the value for each year using three methods weighted evenly at 33.3%: (1) the discounted cashflow method; (2) the guideline public company method; and (3) the guideline company transaction method.

**[*14]**        1.  <u>Discounted Cashflow Method</u>

The discounted cashflow (DCF) method is a method within the income approach whereby the present value of future net expected cashflow is calculated using a discount rate.  The DCF method comprises four steps:  (1) project future cashflows for a discrete projection period; (2) discount these cashflows to present value at a rate of return (e.g., discount rate) that considers the relative risk of achieving the cashflows and the time value of money; (3) estimate the residual value of cashflows following the discrete projection period; and (4) combine the present value of the residual cashflows with the discrete projection period cashflows.  Cash on hand is then added to determine the fair value of the market value of invested capital (MVIC).

Mr. Murphy made three key assumptions in applying the DCF method:  (1) estimate of a discount rate; (2) financial projections; and (3) terminal value.

Mr. Murphy developed the future expected cashflow projections applied in his DCF method using three sources:  (1) year 1 of his projection period uses management's forecast; (2) years 2 through 4 of his projection use industry growth statistics, such as expectations of the growth of the U.S. residential construction market, expectations of inflation in the United States, and the historical relationship between growth in Florida residential construction and U.S.

[*15] residential construction; and (3) year 5 of his projection period uses industry statistics, such as expectations of inflation in the United States and projected Florida population growth.

Mr. Murphy concluded that a willing buyer and a willing seller would have relied on FECP's management's forecasts when available and reverted to an estimated revenue growth or a long-term growth rate forecast when management's forecasts were not available. His estimates did not include any effect for fraud. The following table shows Mr. Murphy's forecasts for FECP during 2002-06:

| Year ending 12/31 | EBIT |
|---|---|
| 2002 | $7,064,249 |
| 2003 | 15,595,640 |
| 2004 | 31,124,993 |
| 2005 | 52,131,279 |
| 2006 | 59,764,650 |

The projected cashflows anticipated to be generated by a business are discounted to their present value equivalent using a rate of return that reflects the relative risk of investment as well as the time value of money. The rate of return is an overall rate based upon the individual rates of return for invested capital. The rate of return, also known as the weighted average cost of capital (WACC), is calculated by weighting the required returns on interest-bearing debt and

[*16] shareholder's equity in proportion to their estimated percentages assuming an industry-based capital structure.

The rate of return on equity capital in Mr. Murphy's valuation analyses was estimated using the modified capital asset pricing model (MCAPM). The MCAPM was used to estimate the return required by equity investors given the company's risk profile.

The terminal value represents the amount an investor would pay today for the rights to the cashflows of the business for years following the discrete projection period. Mr. Murphy capitalized the projected cashflows beginning in the terminal period into perpetuity. Depreciation, capital expenditures, and working capital requirements were normalized to match long-term expectations of revenue. Normalized available cashflows were then capitalized using a rate calculated by subtracting the long-term growth rate from the overall WACC. This methodology is commonly referred to as the "Gordon Growth Model" and is a method widely used by business valuation professionals.

## 2. The Guideline Public Company Method

The guideline public company method (GPC) is used to calculate the fair value of a business on the basis of comparison to publicly traded companies in similar lines of business. The conditions and prospects of companies in similar

[*17] lines of business depend on common factors such as overall demand for their products and services. Mr. Murphy identified six companies to compare to FECP. The GPC analysis incorporated various multiples of the enterprise value, calculated by adding (1) the market value of common equity, based on stock prices for the guideline companies as of the valuation dates; (2) plus total debt, preferred stock, and minority interests; (3) minus cash and cash equivalents on hand. Mr. Murphy's multiples included enterprise value divided by revenue and enterprise value divided by earnings before interest, taxes, depreciation and amortization (EBITDA).

Mr. Murphy used multiples of revenue of 0.6, 1.2, 1.9, 1.6, 1.8, and 1.4 for the years ended December 31, 2002, 2003, 2004, 2005, 2006, and 2007, respectively. Mr. Murphy used multiples of earnings of 4.9, 7.0, 8.9, 5.1, 6.7, and 4.0 for the years ended December 31, 2002, 2003, 2004, 2005, 2006, and 2007, respectively.

### 3. The Guideline Company Transactions Method

The guideline company transactions (GCT) method values a business by comparing it to similar businesses that have been acquired in private transactions, including mergers and acquisitions. To value FECP using the GCT method, Mr. Murphy searched for similar transactions with sufficient financial and

[*18] transactional data based on business descriptions. Mr. Murphy's multiples included enterprise value divided by revenue and enterprise value divided by EBITDA.

Mr. Murphy used multiples of revenue of 0.9, 1.2, 1.9, 1.7, 1.8, and 1.1 for the years ended December 31, 2002, 2003, 2004, 2005, 2006, and 2007, respectively. Mr. Murphy used multiples of earnings of 6.3, 6.2, 6.9, 7.3, 7.5, and 7.0 for the years ended December 31, 2002, 2003, 2004, 2005, 2006, and 2007, respectively.

4. Conclusions

The following table summarizes Mr. Murphy's conclusions:[5]

| Year | DCF | GPC | GCT | Weighted MVIC | Debt | Liability | Equity valuation |
|------|------|------|------|------|------|------|------|
| 2002 | $50.8 | $33.2 | $45.5 | $43.2 | $ 2.9 | $7 | $33.4 |
| 2003 | 88.3 | 79.3 | 75.5 | 81 | 1.3 | 12.6 | 67 |
| 2004 | 267.2 | 229 | 194.9 | 230.4 | -0- | 27.5 | 202.9 |
| 2005 | 263.5 | 213.8 | 264.6 | 247.3 | -0- | 56.7 | 190.6 |
| 2006 | 308.0 | 292.3 | 318.4 | 306.2 | -0- | 100.9 | 205.3 |
| 2007 | 52.9 | 64.7 | 74.4 | 64 | -0- | 137.3 | (73.3) |

---

[5]Amounts listed are in millions.

**[\*19]** Mr. Murphy opined that FECP was not insolvent on December 31, 2006, or any date before but was insolvent as of December 31, 2007.

OPINION

## I. Transferee Liability

### A. Burden of Proof

Section 6901(a)(1) is a procedural statute authorizing the assessment of transferee liability in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the transferee liability was incurred. Section 6901(a) does not create or define a substantive liability but merely provides the Commissioner a remedy for enforcing and collecting from the transferee of the property the transferor's existing liability. Coca-Cola Bottling Co. v. Commissioner, 334 F.2d 875, 877 (9th Cir. 1964), aff'g 37 T.C. 1006 (1962); Mysse v. Commissioner, 57 T.C. 680, 700-701 (1972). Section 6902(a) and Rule 142(d) provide that the Commissioner has the burden of proving the taxpayer's liability as a transferee but not of showing that the transferor was liable for the tax.

Under section 6901(a) the Commissioner may establish transferee liability if a basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts. Commissioner v. Stern, 357 U.S. 39,

**[\*20]** 42-47 (1958); Bresson v. Commissioner, 111 T.C. 172, 179-180 (1998), aff'd, 213 F.3d 1173 (9th Cir. 2000); Starnes v. Commissioner, T.C. Memo. 2011-63. "[T]he existence and extent of liability should be determined by state law." Commissioner v. Stern, 357 U.S. at 45. Thus, State law determines the elements of liability, and section 6901 provides the remedy or procedure to be employed by the Commissioner as the means of enforcing that liability. Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), aff'g 35 T.C. 1148 (1961).

We must determine whether respondent has shown that petitioners were liable as transferees.

### B. Preliminary Issues

Petitioners argue that they are not liable as transferees because respondent failed to exhaust collection efforts against more culpable parties. First, they argue that respondent's installment plan agreement with FECP cuts off their transferee liability. Second, they argue that respondent's failure to exhaust his collection options against FECP precludes him from seeking to recover from them as transferees. Finally, petitioners contend that respondent's failure to exhaust collection efforts against more culpable transferees precludes him from collecting from them. We will address each of these arguments in turn.

**[*21]**      1. Effect of FECP's Installment Plan Agreement

Respondent agreed to allow FECP to pay its outstanding tax liability in monthly installments of $70,000. Under the installment plan agreement respondent will review FECP's ability to pay every two years and may adjust the monthly payment accordingly. Petitioners argue that this agreement should prevent respondent from collecting from transferees. Their argument is as follows: Petitioners' liability is derivative of FECP's liability; in agreeing to the installment plan respondent has reduced the amount of that liability to the amount collectible under the installment plan; because respondent will collect that full amount from FECP, petitioners have no further liability as transferees.

The acceptance of an installment plan agreement by the Commissioner does not reduce the amount of tax, interest, or penalties owed by the delinquent taxpayer. Sec. 301.6159-1(c)(1)(ii), Proced. & Admin. Regs. However, payments by the transferor may eliminate or reduce the amount that may be collected from the transferee. See, e.g., Estate of Stein v. Commissioner, 40 T.C. 275, 278 (1963); Leach v. Commissioner, 21 T.C. 70 , 79 (1953); Quirk v. Commissioner, 15 T.C. 709 (1950), aff'd, 196 F.2d 1022 (5th Cir. 1952). Respondent's recovery from the installment plan agreement with FECP to date is a small piece of the overall tax liability owed. Respondent may take collection action, other than levy,

**[\*22]** to protect the interests of the Government with regard to the liability defined in the installment plan agreement. Sec. 301.6159-1(f)(3), Proced. & Admin. Regs. Respondent may take action to collect from any person who is not named in the installment plan agreement but is liable for the tax which relates to it. Sec. 301.6159-1(f)(3)(i)(C), Proced. & Admin. Regs. The installment plan agreement between FECP and respondent does not preclude petitioners from facing transferee liability. Further, as a practical matter a decision against petitioners does not relieve the principal, FECP, of its liability under the installment plan agreement with respondent because of the large outstanding tax liability of FECP.

> 2. Respondent's Failure To Exhaust Collection Efforts Against FECP

Petitioners cite a number of steps respondent could have taken that might have resulted in greater collections from FECP. Respondent could have seized FECP's assets and sold them for about $3 million, but instead he agreed to the installment plan to allow FECP to continue operating.

We must look to Florida law to determine whether respondent has an obligation to pursue all reasonable collection efforts against a transferor before proceeding against a transferee. See Hagaman v. Commissioner, 100 T.C. 180, 183-184 (1993); Jefferies v. Commissioner, T.C. Memo. 2010-172; Upchurch v.

**[\*23]** <u>Commissioner</u>, T.C. Memo. 2010-169.[6]  The Florida Uniform Fraudulent

---

[6] In <u>Gumm v. Commissioner</u>, 93 T.C. 475, 480 (1989), <u>aff'd without published opinion</u>, 933 F.2d 1014 (9th Cir. 1991), the Tax Court listed the following general requirements for transferee liability:

> (1) That the alleged transferee received property of the transferor; (2) that the transfer was made without consideration or for less than adequate consideration; (3) that the transfer was made during or after the period for which the tax liability of the transferor accrued; (4) that the transferor was insolvent prior to or because of the transfer of property or that the transfer of property was one of a series of distributions of property that resulted in the insolvency of the transferor; (5) that all reasonable efforts to collect from the transferor were made and that further collection efforts would be futile; and (6) the value of the transferred property (which determines the limit of the transferee's liability) * * * .  [Citations omitted.]

Id.  Petitioners state that respondent must exhaust all reasonable efforts to collect from the transferor unless further collection procedures would be futile.  However, in <u>Hagaman v. Commissioner</u>, 100 T.C. 180, 183-184 (1993), the Tax Court explained:

> Professors Bittker and Lokken have stated that "This distillation of what is sometimes called the trust fund theory is a useful guide, but, to the extent it implies there is a common body of national law protecting the rights of creditors, it must yield to the Supreme Court's admonition in <u>Stern</u> that 'the existence and extent of [transferee] liability should be determined by state law.'"  4 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 111.6.7, at 111-188 (2d ed.1992) (quoting <u>Commissioner v. Stern</u>, supra at 45) (fn. ref. omitted). We agree with Professors Bittker and Lokken. We would therefore emphasize that <u>Gumm</u>'s distillation of the trust fund theory is viable only as a <u>generalization</u> of typical State law; section 6901 does not itself impose those requirements. We would further caution that <u>Gumm</u>'s distillation of the trust fund theory, which

(continued...)

[*24] Transfer Act (FUFTA) does not require a creditor to pursue all reasonable collection efforts against the transferor. See Fla. Stat. Ann. secs. 726.101-726.112 (West 2012). Therefore, respondent was not required to exhaust collection efforts against FECP, and petitioners may be held liable.

> 3. Respondent's Failure To Exhaust Collection Efforts Against Messrs. Stanton and Hughes

Petitioners argue that respondent may not collect from them because he did not exhaust collection efforts against Messrs. Stanton and Hughes. Petitioners cite no authority for their argument that respondent must pursue all potential transferees.

We have held that the Commissioner may proceed against any or all transferees in no particular order. Cullifer v. Commissioner, T.C. Memo. 2014-208, at *73-*74. Further, transferee liability is several under section 6901. Alexander v. Commissioner, 61 T.C. 278, 295 (1973). Therefore, respondent may

----

[6](...continued)
theory pertains to transferee liability in equity, is not a useful guide regarding transferee liability at law (e.g., under a corporate merger statute or bulk sales law), whose elements typically are quite different. * * *

Thus, we do not view Gumm's requirements as controlling here to the extent they do not reflect Florida law, as indicated by Commissioner v. Stern, 357 U.S. 39 (1958).

**[\*25]** pursue petitioners without first exhausting collection efforts against Messrs. Stanton and Hughes.

    C. <u>Fraudulent Transfer</u>

Respondent contends that petitioners are liable as transferees because the transfers they received were both actually and constructively fraudulent. Before we address respondent's arguments, we must determine how to evaluate each transfer. Respondent urges us to group together both the transfers petitioners received and the transfers Messrs. Hughes and Stanton received because, respondent contends, FECP made all of the transfers as part of a comprehensive scheme to defraud the IRS. Petitioners argue that we should evaluate each transfer individually.

Respondent cites several cases in which courts have aggregated transfers when each was part of a fraudulent scheme. Respondent argues that the transfers to petitioners were part of Messrs. Hughes and Stanton's scheme to defraud the IRS. Respondent describes how FECP systematically eliminated all of the controls that would have detected their fraud and intentionally misled the IRS by failing to report its income. Respondent also demonstrates that Messrs. Hughes and Stanton used various corporations to confuse the IRS about FECP's activities. The facts establish that Messrs. Hughes and Stanton organized a scheme to

**[\*26]** defraud the IRS, but they do not establish that the payments petitioners received were part of this scheme.

Messrs. Hughes and Stanton hoped to take as much money from FECP as possible. To that end they decided not to have FECP pay tax on its income. They distributed pretax profits to themselves in the form of dividends and interest payments. They also distributed pretax profits to petitioners in the form of dividends and "advances". We think it is clear that the distributions to Messrs. Hughes and Stanton were made with the intent to defraud respondent; the question is whether we should impute that intent to the distributions to petitioners. We do not think we should.

During the years at issue FECP was experiencing unprecedented growth. Petitioners' hard work was instrumental in FECP's success, and they likely would have become suspicious if they had not been compensated fairly. Messrs. Hughes and Stanton wanted to take money for themselves; they devised a scheme from which petitioners incidentally benefited, but the payments they received were not made with the same intent as those Messrs. Hughes and Stanton received. Accordingly, we decline to group the transfers to petitioners with the transfers to Messrs. Hughes and Stanton for the purpose of determining whether the transfers to petitioners were fraudulent.

**[*27]**          1. <u>Constructive Fraud</u>

FUFTA provides three scenarios under which transfers may be constructively fraudulent. Each scenario requires the debtor to have received less than "reasonably equivalent value" for the transfer. If the debtor did not receive reasonably equivalent value, the transfer is fraudulent if: (1) the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; (2) the debtor intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due; and (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. Fla. Stat. Ann. secs. 726.105(1)(b), 726.106(1).

a. <u>Reasonably Equivalent Value</u>

First we will address whether FECP received reasonably equivalent value for the transfers at issue. If it did, the transfers cannot be constructively fraudulent. To resolve this issue we must determine what FECP received in return for the transfers at issue. FUFTA provides that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an

[*28] underperformed promise made otherwise than in the ordinary course of the promisor's business to furnish to the debtor or another person." Fla. Stat. Ann. sec 726.101(1).

The totality of the circumstances is examined in assessing whether value was given, including "the fair market value of the item or service received compared to the price paid, the arms-length nature of the transaction, and the good faith of the transferee." Official Comm. of Unsecured Creditors v. Florida (In re Tower Envtl., Inc.), 260 B.R. 213, 225 (Bankr. M.D. Fla. 1998) (citing Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc., (In re R.M.L., Inc.), 92 F.3d 139, 150 (3d Cir.1996)).

By their nature, the transfers fall within two groups: (1) the 2003 and 2004 transfers and (2) the 2005, 2006, and 2007 transfers, and we analyze the two groups separately.

2003 and 2004 Transfers

FECP suspended its bonus program after 2002. Petitioners had become accustomed to receiving $25,000 bonuses every month under the program. To offset the financial hardship resulting from the suspension of the bonus program, Messrs. Hughes and Stanton decided to make advances to petitioners. Those advances are the 2003 and 2004 transfers at issue.

**[*29]** When petitioners asked Mr. Stanton how they should report the transfers on their returns, he told them that they were loans that did not have to be reported. Consequently, neither petitioner reported them as compensation on his return. The IRS later audited each petitioner's individual returns and determined the payments were dividends. Petitioners settled their respective cases and paid tax on the transfers. Respondent urges us to bind petitioners to statements they made in their petitions for their individual deficiency cases. We decline to do so; we will no more bind them to their statements in their petitions than we will bind respondent to his statements in his answers to those petitions. See Pert v. Commissioner, 105 T.C. 370, 380 (1995) ("[W]e decline to reconsider the well-established principle that a Tax Court decision entered pursuant to the stipulation of the parties is considered to be judgment on the merits for purposes of res judicata."). We will independently evaluate the nature of the payments.

Petitioners argue that each transfer was compensation and that the work they performed for FECP constitutes reasonably equivalent value. Respondent concedes that the transfers were not fraudulent if they were compensation for services petitioners performed, but he contends that they were not compensation. Respondent believes that the 2003 and 2004 transfers were loans that were never repaid and that the 2005, 2006, and 2007 transfers were dividends.

**[*30]** Because the loans were never repaid, respondent argues, FECP did not receive reasonably equivalent value for the 2003 and 2004 transfers. He argues that FECP did not receive reasonably equivalent value for the other transfers, because, by definition, dividends cannot be issued in exchange for reasonably equivalent value. To determine whether FECP received reasonably equivalent value for the transfers it made to petitioners, we must determine why it made the transfers.

Before 2003 FECP had a bonus program through which petitioners received significant compensation. In 2003 FECP decided to temporarily suspend the bonus program. Mr. Hughes knew that petitioners would struggle to maintain their standards of living without the bonuses. Consequently, he decided to pay them "advances" on future bonuses and told them they would have to repay them when FECP reinstituted the bonus program. Mr. Kardash received $250,000 and $300,000 of "advances" in 2003 and 2004 respectively; Mr. Robb received $250,000 and $200,000.

We think the "advances" were compensation. Petitioners received them in lieu of bonuses, and FECP never expected repayment. Petitioners did not have to sign loan agreements or make interest payments, and the amounts are roughly what they would have received under the suspended bonus program. Because

**[*31]** petitioners gave reasonably equivalent value for the 2003 and 2004 transfers, they were not constructively fraudulent.

2005, 2006, and 2007 Transfers

Petitioners argue that the transfers they received in 2005, 2006, and 2007 were compensation for services performed and that thus they gave reasonably equivalent value for them. Respondent argues that the transfers were dividends and that consequently petitioners did not give reasonably equivalent value for them.

If the 2005, 2006, and 2007 transfers were dividends, FECP likely did not receive reasonably equivalent value for them. Under the Uniform Fraudulent Transfer Act, a distribution of dividends that is not compensation or salary for services rendered is not a transfer in exchange for reasonably equivalent value. See Fisher v. Hamilton (In re Teknek, LLC), 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (citing Sherman v. FSC (In re Brentwood Lexford Partners, LLC), 292 B.R. 255, 267-268 (Bankr. N.D. Tex 2003)).

In a limited number of cases, other courts have found that certain dividends were made in exchange for reasonably equivalent value. See Crumpton v. Stephens (In re Northlake Foods, Inc.), 715 F.3d 1251 (11th Cir. 2013); Pryor v. Tiffen (In re TC Liquidations, LLC), 463 B.R. 257 (Bankr. E.D.N.Y. 2011). In

**[*32]** those cases, however, the debtors received something of value that was specifically related to the dividends.

In <u>Northlake Foods</u> the debtor, which had recently elected S corporation status, made a distribution to one of its shareholders to pay his tax liability associated with his share of the corporation's income. The debtor made the distribution pursuant to an agreement it had made with the shareholder long before the debtor became insolvent. Under the agreement, the corporation had to pay the shareholder's tax liability if the corporation ever elected S corporation status. The court held that the tax flexibility granted to the corporation by the agreement and cashflow benefits represented reasonably equivalent value for the later dividend.

In <u>TC Liquidations</u> the debtor paid its shareholders dividends, but the shareholders used the dividend proceeds to repay loans that they had taken out to expand the debtor's business. On these facts the court determined that the debtor had received fair consideration for those dividends.

FECP did not benefit from the dividends it paid to petitioners. Petitioners argue that the dividends were compensation for their work, but neither FECP nor petitioners treated the payments as compensation. FECP issued Forms 1099-DIV for the payments, and petitioners reported the payments as dividends on their individual tax returns. Accordingly, we hold that FECP did not receive reasonably

[*33] equivalent value for the 2005, 2006, and 2007 transfers at issue.

Consequently, we will find any of the transfers during these years constructively

fraudulent if FECP (1) was insolvent at the time of the transfer or became

insolvent as a result of the transfer, (2) was engaged or was about to engage in a

business or a transaction for which its remaining assets were unreasonably small in

relation to the business or transaction, or (3) intended to incur, or believed or

reasonably should have believed that it would incur, debts beyond its ability to pay

as they became due.

### b. Insolvency

For a company to be solvent, the fair value of its assets must equal or

exceed the sum of its debts. Fla. Stat. Ann. sec. 726.103. If a debtor is not paying

its debts as they become due, we presume the debtor is insolvent. Id.

Petitioners argue that, should we find that FECP was insolvent during the

years at issue, they should not be liable if FECP made transfers to them while it

was insolvent, because any insolvency resulted from Messrs. Hughes' and

Stanton's stripping the company. Petitioners essentially ask us to include in

FECP's assets, for purposes of our solvency analysis, the amounts Messrs. Hughes

and Stanton took from the company. However, FUFTA's definition of insolvency

explicitly instructs us not to consider as assets "property that has been transferred,

[*34] concealed, or removed with intent to hinder, delay, or defraud creditors." Id. sec. 726.103(4). Accordingly, we do not think it is appropriate to include in our solvency analysis the assets Messrs. Hughes and Stanton fraudulently removed from FECP.

Both parties have presented expert witness testimony concerning FECP's solvency during the years at issue. The parties agree that the company was solvent in 2002 but insolvent by 2007. They also agree that the transfers to Messrs. Stanton and Hughes contributed in large part to the insolvency. They disagree about when exactly the company became insolvent. Respondent argues that the company was insolvent when each payment was made. Petitioners argue that the company did not become insolvent until 2007, after they had received the last of the transfers at issue. The experts substantially agree on the value of FECP's debts; they disagree about the value of the assets.

An analysis of the experts' reports shows that FECP was insolvent for all transfers starting in 2005. It is clear FECP was insolvent once the dividends were transferred to the shareholders beginning in 2005, essentially stripping the company of its assets. Other than the tax liability of FECP, there is no evidence that FECP was not paying its debts as they became due. Further, even with the advance payments in 2003 and 2004, FECP's assets exceeded the fair value of its

[*35] debts. However, with the large distributions of money to the shareholders starting in 2005 and the accumulation of the tax liability, FECP's assets did not exceed the fair value of its debts. We find that FECP was solvent for the years 2003 and 2004 and insolvent for the years 2005, 2006, and 2007.

We need not address whether when it made the transfers at issue FECP had unreasonably small assets to continue its business or intended to incur debts beyond its ability to pay. The transfers petitioners received in 2003 and 2004 are not fraudulent under any of FUFTA's constructive fraud provisions because petitioners gave reasonably equivalent value for them. Petitioners did not give reasonably equivalent value for the transfers they received in 2005, 2006, and 2007, and FECP was insolvent when it made those transfers. Accordingly, those transfers are constructively fraudulent under Fla. Stat. Ann. sec. 726.106(1). We need not address whether they are also fraudulent under FUFTA's other constructive fraud provisions.

## 2. Actual Fraud

FUFTA sec. 726.105(1)(a) also provides that a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder,

**[*36]** delay, or defraud any creditor of the debtor. Respondent was a creditor of FECP by virtue of FECP's unpaid tax liability. Respondent argues that FECP made the transfers at issue with actual intent to hinder, delay, or defraud the IRS. Respondent's argument that the transfers at issue were actually fraudulent depends on our grouping them together with the transfers to Messrs. Hughes and Stanton. We decline to do so.

In determining actual intent, consideration may be given among other factors, to whether:

(a) [t]he transfer or obligation was to an insider[;]

(b) the debtor retained possession or control of the property transferred after the transfer[;]

(c) the transfer or obligation was disclosed or concealed[;]

(d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit[;]

(e) the transfer was of substantially all of the debtor's assets[;]

(f) the debtor absconded[;]

(g) the debtor removed or concealed assets[;]

(h) the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred or the amount of the obligation incurred[;]

**[*37]** (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred[;]

(j) the transfer occurred shortly before or shortly after a substantial debt was incurred[;]

(k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla Stat. Ann. sec. 726.105(2)(a)-(k).

To prevail under this section of FUFTA, respondent must show that the transfer was made "with actual intent to hinder, delay, or defraud" creditors. Although one badge of fraud "may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance, * * * several of them when considered together may afford the basis to infer fraud." Johnson v. Dowell, 592 So. 2d 1194, 1197 (Fla. Dist. Ct. App. 1992). Respondent contends that factors (a), (c), (d), (e), (g), (h), (i), and (j) of FUFTA sec. 105(2) are present. We do not need to determine whether the 2005, 2006, and 2007 transfers were actually fraudulent because they were constructively fraudulent. Thus, we address only whether the 2003 and 2004 transfers were actually fraudulent.

Factor (a). Whether the Transfer or Obligation Was to an Insider

In the case of a corporation, an "insider" includes a director or an officer of the corporation. Fla. Stat. Ann. sec. 726.102(7)(b). Mr. Kardash was an officer of

**[*38]** the corporation in his capacity as secretary for all relevant years. See id. sec. 726.102; id. sec. 607.01401(23) (West 2007).

The FECP bylaws state that an officer "may include one or more vice presidents * * * . The officers will be elected initially by the board of directors at the organization meeting of directors and, after that, at the first meeting of the board of directors following the annual meeting of the shareholders each year." Mr. Robb was a vice president, but there is no evidence that he was elected as an officer by the board of directors. Therefore, respondent has not shown that Mr. Robb was an insider for all relevant years.

Factor (c). Whether the Transfer or Obligation Was Disclosed or Concealed

The transfers were not originally properly reported as compensation on any Forms W-2 or Forms 1099. Mr. Stanton told petitioners that the transfers for 2003 and 2004 were loans to be repaid at a later date, but the loans were not evidenced by written promissory notes. The 2003 and 2004 transfers were not properly disclosed at the time by loan documents or wage forms.

Factor (d). Whether Before the Transfer Was Made or Obligation Was Incurred, the Debtor Had Been Sued or Threatened With Suit

Respondent argues that FECP was threatened with suit because FECP made the transfers at issue knowing it faced potential adjustments and tax deficiencies,

**[*39]** together with the imposition of penalties, additions to tax, and interest due to the filing of fraudulent income tax returns. Respondent cites a string of cases where courts have found transfers to be fraudulent when the debtor was under an IRS audit.[7] Further, we have found that a debtor had been threatened with suit when an IRS revenue agent gave a taxpayer a copy of recommended adjustments the taxpayer disagreed with. Pert v. Commissioner, T.C. Memo. 1997-150. FECP was not under an IRS audit until 2005. We therefore will not find that FECP was threatened with suit when the 2003 and 2004 transfers occurred.

Factor (e). Whether the Transfer Was of Substantially All of the Debtor's Assets

Mr. Kardash received $250,000 and $300,000 and Mr. Robb received $250,000 and $200,000 in 2003 and 2004, respectively. These amounts did not constitute substantially all of the debtor's assets as both petitioners' expert and respondent's expert valued FECP's assets at well above the amounts of the transfers.

---

[7]United States v. Coppola, 85 F.3d 1015, 1016 (2d Cir. 1996); Veigle v. United States, 873 F. Supp. 623, 627 (M.D. Fla. 1994); Harper v. United States, 769 F. Supp. 362, 367 (M.D. Fla. 1991).

**[\*40]** Factor (g). <u>Whether the Debtor Removed or Concealed Assets</u>

Respondent argues that the transfers to Mr. Stanton and Mr. Hughes were part of FECP's general plan or scheme to remove and conceal assets to hinder, delay, or defraud respondent's collection efforts and by making the transfers at issue, FECP removed assets that it should have used instead to pay respondent and the State of Florida. Further, respondent argues that the transfers to petitioners during 2003 and 2004 were concealed. Those transfers were not a removal of assets, nor were they concealed. While the transfers to petitioners were not properly disclosed, they were not concealed but evidenced by bank transactions. Further, there was a pattern of paying petitioners large bonuses, and the 2003 and 2004 transfers were a continuation of the bonus plan.

Factor (h). <u>Whether the Value of the Consideration Received by the Debtor Was Reasonably Equivalent to the Value of the Asset Transferred or the Amount of the Obligation Incurred</u>

As discussed above, the transfers made to petitioners in 2003 and 2004 were reasonably equivalent to the value of the assets transferred.

**[*41]** Factor (i). <u>The Debtor Was Insolvent Shortly After Transfer Was Made or Obligation Incurred</u>

As discussed above, FECP did not became insolvent shortly after the transfers were made to the shareholders in 2003 and 2004 but instead became insolvent because of the transfers starting in 2005.

Factor (j). <u>Whether the Transfer Occurred Shortly Before or After a Substantial Debt Incurred</u>

The transfers to petitioners did occur shortly after FECP incurred tax liabilities. <u>See</u> <u>Hagaman v. Commissioner</u>, 100 T.C. at 188 (noting that Federal taxes are due and owing, and constitute a liability, at the close of the taxable year); <u>Yagoda v. Commissioner</u>, 39 T.C. 170, 185 (1962) (noting that a transferee is liable for all existing debts of the transferor, "whether or not such debts had been determined, or were even known at that time"), <u>aff'd</u>, 331 F.2d 485 (2d Cir.1964).

After weighing the factors, and recognizing that no one factor is dispositive, we conclude that respondent has not shown that a transfer was made with intent to hinder, delay, or defraud respondent.

II. <u>Conclusion</u>

We conclude that respondent has not established that the transfers for 2003 and 2004 are fraudulent under Florida law. We conclude that respondent has established that the transfers for 2005, 2006, and 2007 are fraudulent under

**[\*42]** Florida law. Accordingly, we hold that petitioners are liable as transferees under section 6901(a) for the years 2005, 2006, and 2007. In reaching our holdings herein, we have considered all arguments made by the parties, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decisions will be entered for petitioners as to the taxable years 2003 and 2004 and for respondent as to the taxable years 2005, 2006, and 2007 in docket Nos. 12681-10 and 12703-10.